GUTRIDE SAFIER LLP
Seth A. Safier (State Bar No. 197427)
  seth@gutridesafier.com
Marie A. McCrary (State Bar No. 262670)
  marie@gutridesafier.com
Todd Kennedy (State Bar No. 250267)
  todd@gutridesafier.com
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 639-9090
Facsimile:  (415) 449-6469

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHERI TUCKER and MEGAN DRISCOLL, individuals, on behalf of themselves, the general public, and those similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>ASHLEY GLOBAL RETAIL, LLC,<br><br>Defendant. | CASE NO.<br><br>CLASS ACTION COMPLAINT FOR INVASION OF PRIVACY; INTRUSION UPON SECLUSION; WIRETAPPING IN VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT (CALIFORNIA PENAL CODE § 631); USE OF A PEN REGISTER IN VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT (CALIFORNIA PENAL CODE § 638.51); COMMON LAW FRAUD, DECEIT AND/OR MISREPRESENTATION; AND UNJUST ENRICHMENT<br><br>JURY TRIAL DEMANDED |

CLASS ACTION COMPLAINT

**TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................................... 0

THE PARTIES........................................................................................................................... 2

JURISDICTION AND VENUE ................................................................................................ 2

TOLLING AND RELATED ARBITRATION PROCEEDING .................................................. 3

SUBSTANTIVE ALLEGATIONS ............................................................................................ 4

    A.    Defendant Programmed the Website to Include Third-Party Resources that Utilize Cookie-Based Tracking Technologies. ....................................................... 4

    B.    Defendant Falsely Informed Users That They Could Reject the Website's Use of Cookies and Similar Technologies, Including Real-Time Collection. ........................................................................................................... 13

    C.    The Private Communications Intercepted and Collected Through Third-Party Cookies on Defendant's Website. .......................................................... 20

        1.    The Website Causes the Interception of the Contents of Communications. ................................................................................. 20

        2.    Facebook Cookies. ................................................................................. 22

        5.    TikTok Cookies. .................................................................................... 35

        7.    Additional Third-Party Cookies............................................................ 43

    D.    The Third Parties Intercept User Communications While in Transit. ............... 45

    E.    The Signaling and Addressing Information Intercepted by the Third Parties.................................................................................................................. 49

    F.    The Private Communications Collected are Valuable. ...................................... 51

PLAINTIFFS' EXPERIENCES ............................................................................................... 52

CLASS ALLEGATIONS ......................................................................................................... 58

CAUSES OF ACTION............................................................................................................. 60

    First Cause of Action: Invasion of Privacy.................................................................. 60

    Second Cause of Action: Intrusion Upon Seclusion..................................................... 63

    Third Cause of Action: Wiretapping in Violation of the California Invasion of Privacy Act (California Penal Code § 631) ......................................................... 65

    Fourth Cause of Action: Use of a Pen Register in Violation of the California Invasion of Privacy Act (California Penal Code § 638.51) .............................. 70

    Fifth Cause of Action: Common Law Fraud, Deceit and/or Misrepresentation............. 71

CLASS ACTION COMPLAINT

Sixth Cause of Action: Unjust Enrichment ................................................................... 74

PRAYER FOR RELIEF ...................................................................................................... 75

CLASS ACTION COMPLAINT

Plaintiffs Sheri Tucker and Megan Driscoll (collectively, "Plaintiffs") bring this action on behalf of themselves, the general public, and all others similarly situated against Ashley Global Retail, LLC ("Defendant" or "Ashley Furniture"). Plaintiffs' allegations against Defendant are based on information and belief and the investigation of Plaintiffs' counsel, except for allegations specifically pertaining to Plaintiffs, which are based on their personal knowledge.

## INTRODUCTION

1.      This Class Action Complaint concerns egregious violations of consumer privacy and breach of consumer trust in violation of California law. When consumers visit Defendant's ecommerce website (www.ashleyfurniture.com, the "Website"), Defendant displays to them a popup cookie consent banner. Defendant's cookie banner discloses that the Website uses cookies but expressly gives users the option to control how they are tracked and how their personal data is used. Defendant assures visitors that, rather than choosing to "Accept All Cookies," users can instead choose to "Configure" cookie consent preferences to "Reject All" cookies, including all Functional Cookies, Quantum Metric Recordings, Performance Cookies, and Target Cookies (other than those "Strictly Necessary Cookies" needed for the Website to function), as shown in the following screenshots (the first of which is closely cropped and enlarged to show key details):

By using this site you agree to our use of cookies and session replay tools to collect real-time information about your use of our site. We use the information to optimize the performance of our website, enhance site navigation, analyze site usage, and assist in our marketing efforts.

Configure     Accept All Cookies

- 0 -
CLASS ACTION COMPLAINT

2.      Like most internet websites, Defendant designed the Website to include resources and programming scripts from third parties that cause those parties to place cookies and other similar tracking technologies on visitors' browsers and devices and/or transmit cookies along with user data. Unlike many websites, however, Defendant affirmatively represented that users could browse the Website without being tracked, followed, or targeted by third-party data brokers and advertisers. Those representations were false.

3.      Even after users elect to "Reject All" cookies, Defendant nonetheless caused multiple third parties—including Meta Platforms, Inc. (Facebook), Alphabet Inc. (Google and DoubleClick), Microsoft Corporation (Clarity), TikTok USDS Joint Venture LLC, LiveRamp Holdings, Inc. (rlcdn.com and liadm.com), Snap Inc. (Snapchat), Zeta Global Corp. (rezync.com), Salesforce, Inc. (p.cquotient.com), and Digioh LLC (lightboxcdn.com) (the "Third Parties")—to place and/or transmit cookies that track users' website browsing activities and intercepted their private communications on the Website.

4.      Contrary to users' express rejection of cookies and tracking technologies on the Website, Defendant caused cookies, including the Third Parties' cookies, to be sent to Plaintiffs and other visitors' browsers, stored on their devices, and transmitted to the Third Parties along with user data. These cookies permitted the Third Parties to track and collect data in real time regarding Website visitors' behaviors and communications, including their browsing history,

- 1 -

CLASS ACTION COMPLAINT

visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California.

5. The Third Parties analyze and aggregate this user data across websites and time for their own purposes and financial gain, including, creating consumer profiles containing detailed information about a consumer's behavior, preferences, and demographics; creating audience segments based on shared traits (such as Millennials, Californians, tech enthusiasts, etc.); and performing targeted advertising and marketing analytics. Further, the Third Parties share user data and/or user profiles to unknown parties to further their financial gain.

6. This type of tracking and data sharing is exactly what the Website visitors sought to avoid when they clicked or selected the "Reject All" button on the Website's Privacy Preference Center (or otherwise adjusted their cookie consent preferences to reject all such cookies). Defendant falsely told Website users that they respected user privacy choices and would refrain from tracking and data sharing when users rejected cookies. Despite receiving clear notice of users' lack of consent, Defendant ignored those choices and violated state statutes and tort duties owed to Plaintiffs and those similarly situated Website users.

## THE PARTIES

7. Plaintiff Sheri Tucker is, and was at all relevant times, an individual and resident of San Leandro, California. Plaintiff intends to remain in California and makes her permanent home there.

8. Plaintiff Megan Driscoll is, and was at all relevant times, an individual and resident of Van Nuys, California. Plaintiff intends to remain in California and makes her permanent home there.

9. Defendant Ashley Global Retail, LLC is a Delaware limited liability company with its principal place of business in Arcadia, Wisconsin.

## JURISDICTION AND VENUE

10. This Court has jurisdiction over the subject matter of this action pursuant to 28

CLASS ACTION COMPLAINT

U.S.C. § 1332(d)(2). The aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; and Plaintiffs and Defendant are citizens of different states.

11.    The injuries, damages and/or harm upon which this action is based, occurred or arose out of activities engaged in by Defendant within, affecting, and emanating from, the State of California. Defendant regularly conducts and/or solicits business in, engages in other persistent courses of conduct in, and/or derives substantial revenue from products and services provided to persons in the State of California. Defendant has engaged, and continues to engage, in substantial and continuous business practices in the State of California.

12.    Further, the Private Communications and data that Defendant causes to be transmitted to Third Parties are routed through servers located in California.

13.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in the state of California, including within this District.

14.    Plaintiffs accordingly allege that jurisdiction and venue are proper in this Court.

**TOLLING AND RELATED ARBITRATION PROCEEDING**

15.    The delayed discovery rule applies to Plaintiffs' claims. Plaintiffs were unaware that, despite rejecting all unnecessary cookies on the Website, Defendant nonetheless caused third-party cookies to be sent to their browsers, stored on their devices, and transmitted to the Third Parties along with their private user data. Plaintiffs could not reasonably have discovered this conduct at the time of their Website visits because it occurred through hidden, technical processes not visible to ordinary users. Nothing about Plaintiffs' experience on the Website would have alerted a reasonable user that their selections were not being honored. Plaintiffs lacked the technical expertise and specialized tools necessary to determine whether the Website honored their opt-out selections or instead continued transmitting their data notwithstanding those selections, and they did not discover Defendant's conduct until a later investigation revealed it.

16.    On or about May 23, 2025, Defendant was notified by Plaintiffs' counsel that it

CLASS ACTION COMPLAINT

was engaging in the conduct alleged herein, including causing third-party cookies and corresponding user data to be stored on consumers' devices and transmitted to third parties despite users' rejection of unnecessary cookies. Despite this notice, Defendant did not disclose this conduct to users or modify its representations regarding users' ability to reject such data sharing.

17. The Website's Terms of Use contain an arbitration agreement that purports to require all Website visitors to arbitrate their disputes with Defendant before the American Arbitration Association. ("AAA").

18. Accordingly, on November 5, 2025, Plaintiff Driscoll filed a demand for arbitration in San Francisco with AAA against Defendant. *See* Ex. A. Plaintiff Driscoll asserted claims in the arbitration arising from the same conduct alleged herein.

19. On November 20, 2025, AAA closed the arbitration. *See* Ex. B. Defendant failed to comply with the AAA policies regarding consumer claims and/or removed themselves from the Consumer Clause Registry, therefore AAA declined to administer the claim and administratively closed the file.

20. Despite exercising reasonable diligence, Plaintiffs were unaware of Defendant's conduct because Defendant affirmatively represented that users could reject unnecessary cookies while simultaneously concealing that such tracking would occur regardless of users' selections. This combination of misrepresentation and omission prevented Plaintiffs from discovering their claims earlier. Defendant is not prejudiced by the timing of this action, as it has long been on notice of the conduct at issue, including through the May 23, 2025 demand letter describing substantially similar claims. These circumstances, including Defendant's concealment and misleading representations, warrant tolling of the statute of limitations.

## SUBSTANTIVE ALLEGATIONS

**A.    Defendant Programmed the Website to Include Third-Party Resources that Utilize**

CLASS ACTION COMPLAINT

**Cookie-Based Tracking Technologies.**

21.     Every website, including the Website, is hosted by a server that sends and receives communications in the form of HTTP requests, such as "GET" or "POST" requests, to and from Internet users' browsers. For example, when a user clicks on a hyperlink on the Website, the user's browser sends a "GET" request to the Website's server. The GET request tells the Website server what information is being requested (e.g., the URL of the webpage being requested) and instructs the Website's server to send the information back to the user (e.g., the content of the webpage being requested). When the Website server receives an HTTP request, it processes that request and sends back an HTTP response. The HTTP request includes the client's IP address, which allows the Website server to identify the origin of the request and return the response.

22.     An IP address (Internet Protocol address) is a unique numerical label assigned to each device connected to a network that uses the Internet Protocol for communication, typically expressed as four sets of numbers separated by periods (e.g., 192.168.123.132 for IPv4 addresses). IP addresses can identify the network a device is on and the specific device within that network. Public IP addresses used for internet-facing devices reveal geographical locations, such as country, city, or region, through IP geolocation databases.

23.     As a result, Defendant knew or should have known that the devices used by Plaintiffs and Class members to access the Website were located in California.

24.     Defendant voluntarily integrated "third-party resources" from the Third Parties into the Website's programming. "Third-party resources" refer to tools, content or services provided by third parties, such as analytics tools, advertising networks, or payment processors, that a website developer utilizes by embedding scripts, styles, media, or application programming interface (API) into the website's code. Defendant's use of the third-party resources on the Website is done so pursuant to agreements between Defendant and those Third Parties.

- 5 -
CLASS ACTION COMPLAINT

25.     The Website causes users' devices to store and/or transmit both first-party and third-party tracking cookies. Cookies are small text files sent by a website server to a user's web browser and stored locally on the user's device. As described below, cookies generally contain a unique identifier which enables the website to recognize and differentiate individual users. Cookie files are sent back to the website server along with HTTP requests, enabling the website to identify the device making the requests, and to record a session showing how the user interacts with the website.

26.     First-party cookies are those that are placed on the user's device directly by the web server with which the user is knowingly communicating (in this case, the Website's server). First-party cookies are used to track users when they repeatedly visit the same website.

27.     A third-party cookie is set by a third-party domain/webserver (e.g., www.facebook.com, www.google.com, clarity.ms, etc.). When the user's browser loads a webpage (such as a webpage of the Website) containing embedded third-party resources, the third-parties' programming scripts typically issue HTTP commands to determine whether the third-party cookies are already stored on the user's device and to cause the user's browser to store those cookies on the device if they do not yet exist. Third-party cookies include an identifier that allows the third-party to recognize and differentiate individual users across websites (including the Website) and across multiple browsing sessions.

28.     As described further below, the third-party cookies stored on and/or loaded from users' devices when they interact with the Website are transmitted to those third parties, enabling them to surreptitiously track in real time and collect Website users' personal information, such as their browsing activities and private communications with Defendant, including the following:

- **Browsing History**: Information about the webpages a Website user visits, including the URLs, titles, and keywords associated with the webpages viewed, time spent on each page, and navigation patterns;

- 6 -

CLASS ACTION COMPLAINT

- **Visit History**: Information about the frequency and total number of visits to the Website;

- **Website Interactions:** Data on which links, buttons, or ads on the Website that a user clicks;

- **User Input Data**: The information the user entered into the Website's form fields, including search queries, the user's name, age, gender, email address, location, and/or payment information;

- **Demographic Information**: Inferences about age, gender, and location based on browsing habits and interactions with Website content;

- **Interests and Preferences**: Insights into user interests based on the types of Website content viewed, products searched for, or topics engaged with;

- **Shopping Behavior**: Information about the Website products viewed or added to shopping carts;

- **Device Information**: Details about the Website user's device, such as the type of device (mobile, tablet, desktop), operating system, and browser type;

- **Referring URL**: Information about the website that referred the user to the Website;

- **Session Information**: Details about the user's current Website browsing session, including the exact date and time of the user's session, the session duration and actions taken on the Website during that session;

- **User Identifiers**: A unique ID that is used to recognize and track a specific Website user across different websites over time; and/or

- **Geolocation Data**: General location information based on the Website user's IP address or GPS data, if accessible, including whether the user is located in California.

CLASS ACTION COMPLAINT

(Collectively, the browsing activities and private communications listed in the bullet points above shall be referred to herein as "Private Communications").

29. Third-party cookies can be used for a variety of purposes, including (i) analytics (e.g., tracking and analyzing visitor behavior, user engagement, and effectiveness of marketing campaigns); (ii) personalization (e.g., remembering a user's browsing history and purchase preferences to enable product recommendations); (iii) advertising/targeting (e.g., delivering targeted advertisements based on the user's consumer profile (i.e., an aggregated profile of the user's behavior, preferences, and demographics); and (iv) social media integration (e.g., enabling sharing of users' activities with social media platforms). Ultimately, third-party cookies are utilized to enhance website performance and generate revenue through data collection and targeted advertising.

30. Defendant is one of several entities that comprise or affiliated with Ashley Furniture.[1] Ashley Furniture is a manufacturer, distributor, and retailer of furniture and home décor products, which it markets and sells through a national chain of brick-and-mortar retail stores under the Ashley name. According to the Website's Privacy Policy, "Ashley Global Retail, LLC operates Ashley and Ashley Outlet retail furniture stores throughout the United States and www.ashley.com,[2] the Ashley retail website." The Website allows visitors to obtain information about Ashley furniture and home décor products and purchase such products online. As they interact with the Website (e.g., by entering data into forms, clicking on links, and making selections), Website users communicate Private Communications to Defendant, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California.

---

[1] The Ashley Furniture Industries website, located at https://www.ashleyfurnitureindustriesllc.com/company/ashley-family/, explains these relationships (accessed 3/30/26).
[2] The URL ashley.com automatically redirects to the URL ashleyfurniture.com.

- 8 -

CLASS ACTION COMPLAINT

31.     Defendant chose to install or integrate its Website with resources from the Third Parties that, among other things, use cookies. Thus, when consumers visit the Website, both first-party cookies and third-party cookies are placed on their devices and/or transmitted. This is caused by software code that Defendant incorporates into their Website, or that Defendant causes to be loaded. Because Defendant controls the Website's software code, and is capable of determining whether a user is accessing the Website from California, Defendant has complete control over whether first-party and third-party cookies are placed on California users' devices and/or transmitted to third parties.

32.     Defendant explained the third-party cookies it used on the Website as follows in its Privacy Policy:

**Cookies and Other Trackers**

**What cookies and other trackers do we use?**

We use cookies and similar tracker methods when you visit our sites.

- A cookie is a small string of text that a website (or online service) stores on a user's browser. It saves data on your browser about your visit to our sites or other sites. It often includes a unique identifier. "First-party cookies" are cookies set by us (or on our behalf) on our sites. "Third-party cookies" are cookies set by other companies (such as Google) whose functionality is embedded into our sites…

- Pixels (also known as "web beacons," "GIFs" or "bugs") are one-pixel transparent images located on web pages or messages. They track whether you have opened these web pages or messages. Upon firing, a pixel logs a visit to the current page or message and may read or set cookies. Pixels often rely on cookies to work, so turning off cookies can impair them. But even if you turn off cookies, pixels can still detect a web page visit.

- JavaScript is a programming language. It can be used to write trackers that, when embedded into a page, allow us to measure how you interact with our sites and other sites.

- SDKs are pieces of code provided by our digital vendors (e.g., third-party advertising companies, ad networks, and analytics providers) in our mobile apps to collect and analyze certain device and user data.

- Device identifiers are user-resettable identifiers comprised of numbers and letters. They are unique to a specific device. They are stored directly on the device. They are used to recognize you and/or your devices(s) on, off and across different apps and devices for marketing and advertising purposes.

- 9 -

CLASS ACTION COMPLAINT

In order to decide what type of ad might interest you, our digital and marketing vendors sometimes link data—inferred from your browsing of other sites or collected from other sources—using a method known as "ID synching" or "cookie synching." To do this, they match the tracker ID they have assigned to you with one or more tracker IDs that are held in another company's database and that are likely also associated with you. Any of the linked trackers may have certain interests and other demographic information attributed to it. That information is then used to determine which ad to show you.

The types of trackers that appear on our sites include:

- **Essential trackers** required for our sites to operate. They allow you to navigate one of our sites and use its services and features (e.g., cookies that help you stay logged in). Without essential trackers, our sites will not run smoothly and our sites, or certain services or features, might not even be available to you simply because of technical limitations.

- **Preference trackers** allowing us to store information about your choices, settings and preferences. They also help us recognize you when you return to our sites, remember your language settings (among others) and customize our sites accordingly. They are not essential to the functioning of our sites.

- **Analytics trackers** collecting or using information about your site use, which helps us improve our sites. Among the uses of analytics trackers are to show us which pages are most frequently visited, help us record difficulties you have with our sites, and track purchases and behaviors leading to purchases. These trackers add up our customers' visits to show us larger patterns in our customers' behavior. We look at these larger patterns to analyze site traffic.

- **Marketing trackers** help us determine which ads or content to show you, both on our sites and on other sites. To do this, these trackers use information about your behavior on various sites to target our ads and content. These trackers allow us to limit the number of times you see our ads and content across your devices. They help us personalize the ads and content we show you. They also enable us to measure the effectiveness of our marketing campaigns.

**You can manage trackers.** [emphasis original][3]

33.    Defendant further explained the types of third-party cookies it used on the Website as follows in its Privacy Preference Center:

---

[3] Ashley Furniture Website Privacy Policy, Date of Last Update: August 3, 2023 (available at https://www.ashleyfurniture.com/privacy-policy) (the "Privacy Policy").

- 10 -

CLASS ACTION COMPLAINT





- 11 -
CLASS ACTION COMPLAINT





- 12 -
CLASS ACTION COMPLAINT



**B.    Defendant Falsely Informed Users That They Could Reject the Website's Use of Cookies and Similar Technologies, Including Real-Time Collection.**

34.    When Plaintiffs and other consumers in California visited the Website, the Website immediately displayed to them a popup cookie consent banner. As shown in the screenshot below, the cookie consent banner stated, "By using this site you agree to our use of cookies and session replay tools to collect real-time information about your use of our site. We use the information to optimize the performance of our website, enhance site navigation, analyze site usage, and assist in our marketing efforts." The banner then purported to provide users the opportunity, rather than choosing to "Accept All Cookies" for these and other purposes, to instead "Configure" the Website's use of cookies, as shown in the following screenshot from the Website (which is closely cropped and enlarged to show relevant content):

By using this site you agree to our use of cookies and session replay tools to collect real-time information about your use of our site. We use the information to optimize the performance of our website, enhance site navigation, analyze site usage, and assist in our marketing efforts.    Configure    Accept All Cookies

35.    Users who clicked or selected the "Configure" button were then directed to Defendant's Privacy Preference Center. There, Defendant further represented that Website users could "Manage Consent Preferences" to "Reject All" cookies, including all "Functional

- 13 -

Cookies," "Quantum Metric Recordings," "Performance Cookies" and "Targeting Cookies" and all other cookies, except those "Strictly Necessary Cookies" the Website needed to function. Users could manage such preferences by clicking or selecting the "Reject All" button, as found on the Privacy Preference Center window as shown in the following screenshot:[4]



36.     Plaintiffs and other Website users who clicked or selected the "Reject All" button, thereby indicating their choice and/or agreement to decline or reject all cookies and tracking technologies in use on the Website (other than those "Strictly Necessary" for the Website to function), could then continue to browse the Website, as the popup cookie consent banner and Privacy Preference Center window disappeared.

37.     Defendant's popup cookie consent banner and Privacy Preference Center led Plaintiffs, and all those Website users similarly situated, to believe that they declined or rejected all cookies and tracking technologies, especially those used to "analyze site usage, and assist in [Defendant's] marketing efforts." The banner further reasonably led Plaintiffs and those Website

---

[4] In the alternative, users could also adjust the available toggle buttons or settings associated with each category of cookies to similarly reject all cookies, including all "Functional Cookies," "Quantum Metric Recordings," "Performance Cookies," "Targeting Cookies," and all other cookies, except "Strictly Necessary Cookies."

CLASS ACTION COMPLAINT

users similarly situated to believe that Defendant would not allow third parties, through cookies, to access their Private Communications with the Website, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, upon clicking or selecting the "Reject All" button.

38.     Defendant's representations, however, were false. In truth, Defendant did not abide by Plaintiffs' or other users' wishes. When Plaintiffs and other Website users clicked or selected the "Reject All" button, they provided notice to Defendant that they did not consent to the placement or transmission of third-party cookies that would allow those parties to obtain their Private Communications with the Website.

39.     Nevertheless, even after receiving that notice, Defendant caused the Third-Party tracking cookies to be placed on Website users' browsers and devices and/or transmitted to the Third Parties along with user data.

40.     In particular, when users clicked or selected the "Reject All" button, Defendant nonetheless continued to cause the Third Parties' cookies to be placed on users' devices and/or transmitted to the Third Parties along with user data, enabling them to collect user data in real time that discloses Website visitors' Private Communications, including browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data. In other words, even when consumers like Plaintiffs tried to protect their privacy by rejecting cookies, Defendant failed to prevent cookies from being transmitted to Third Parties, enabling them to track user behavior and communications.

41.     Some aspects of the operations of the Third-Party cookies on the Website can be observed using specialized tools that log incoming and outgoing Website network transmissions. The following screenshots, obtained using one such tool, show examples of Third-Party cookies being transmitted from a Website user's device and browser to Third Parties even after the user clicked or selected the "Reject All" button in the Website's Privacy Preference Center.

- 15 -

CLASS ACTION COMPLAINT

CLASS ACTION COMPLAINT

CLASS ACTION COMPLAINT

| Name | Meth... | Domain | Coo... ▼ |
|---|---|---|---|
| collect | POST | l.clarity.ms | 1 |
| p | POST | tr.snapchat.com | 1 |
| act | POST | analytics.tiktok.com | 1 |
| collect?v=2&tid=G-X9DRQWMD18&gtm=45je55j0... | POST | analytics.google.com | 1 |
| collect?v=2&tid=G-YJ4C5QGH4Q&gtm=45je55j0v9... | POST | www.google-analytics.com | 1 |
| pebble?tla=bbvd-Ashley-US&activityType=viewPag... | GET | p.cquotient.com | 1 |
| collect?v=1&_v=j101&a=1274140054&t=event&ni... | POST | www.google-analytics.com | 1 |
| collect?en=page_view&dr=www.ashleyfurniture.co... | POST | www.google.com | 1 |
| blob:https://www.ashleyfurniture.com/9bce058c-... | GET | www.ashleyfurniture.com | 0 |
| storage.secure.min.html?loc=https%3A%2F%2Fww... | GET | lpcdn.lpsnmedia.net | 0 |
| sw_iframe.html?origin=https%3A%2F%2Fwww.ashl... | GET | www.googletagmanager.com | 0 |
| storage.secure.min.html?loc=https%3A%2F%2Fww... | GET | lpcdn.lpsnmedia.net | 0 |
| consentreceipts | OPTI... | privacyportal.onetrust.com | 0 |

42.    The screenshots above show the "Network" tab of Chrome Developer Tools, which contains a list of HTTP network traffic transmissions between the user's browser and various third-party websites while the user visited and interacted with Defendant's Website at https://www.ashleyfurniture.com. The screenshots depict only network traffic occurring *after* the user rejected all cookies using the "Reject All" button available in the Privacy Preference Center. As shown above, despite the user's rejection of all cookies, the user's interactions with the Website resulted in the user's browser making a large number of GET and POST HTTP requests to third party web domains like www.facebook.com, www.google.com, clarity.ms, and others. As further shown in the right-hand column of the screenshots, the user's browser sent cookies along with those HTTP requests to the third parties. These screenshots demonstrate that Defendant caused third-party cookie data and users' Private Communications to be transmitted to Third Parties, even after consumers declined or rejected all cookies and tracking technologies

CLASS ACTION COMPLAINT

by clicking or selecting the "Reject All" button. All of these network calls are made to the Third Parties without the user's knowledge, and despite the user's rejection of all cookies.

43.    Plaintiffs' and other Website users' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, were surreptitiously obtained by the Third Parties via these cookies.

44.    As users interact with the Website, even after clicking or selecting the "Reject All" button, thereby declining or rejecting the use of cookies and similar technologies to analyze Website usage and assist in Defendant's marketing efforts, as well as the sale or sharing of the user's personal information with third parties for such functions, or other purposes, more data regarding users' behavior and communications are sent to third parties, alongside the cookie data. The third-party cookies that Defendant wrongfully allows to be stored on users' devices and browsers, and to be transmitted to the Third Parties, causes the Third Parties to track and collect data on users' behaviors and communications, including Private Communications, on the Website. Because third-party cookies cause the Third Parties to track users' behavior across the Internet and across time, user data can be correlated and combined with other data sets to compile comprehensive user profiles that reflect consumers' behavior, preferences, and demographics (including psychological trends, predispositions, attitudes, intelligence, abilities, and aptitudes). These Third Parties monetize user profiles for advertising, sales, and marketing purposes to generate revenue and target advertising to Internet users. Advertisers can gain deep understanding of users' behavioral traits and characteristics and target those users with advertisements tailored to their consumer profiles and audience segments.

45.    The Third Party code that the Website causes to be loaded and executed by the user's browser constitutes a wiretap because, when it is executed, it causes the Third Parties— separate and distinct entities from the parties to the conversations—to use cookies to eavesdrop upon, record, extract data from, and analyze conversations to which they are not parties. When

CLASS ACTION COMPLAINT

the Third Parties use their respective wiretaps on Website users' Private Communications, the wiretaps are not like tape recorders or "tools" used by one party to record the other. The Third Parties each have the capability to use the contents of conversations they collect through their respective wiretaps for their own purposes as described in more detail below.

**C.     The Private Communications Intercepted and Collected Through Third-Party Cookies on Defendant's Website.[5]**

**1.     The Website Causes the Interception of the Contents of Communications.**

46.     The Website includes a search bar and other input fields which users enter information. For example, below is a screenshot of the search bar on the Website where users can type into the search bar to cause the Website to search its contents.



47.     When users input the information into the search bar, they intend to communicate the contents of their search directly to the Website.

48.     Instead, Defendant programmed the Website so that the contents of those communications are intercepted by the Third Parties while the communications are in transit between the user's browser and the Website.

49.     For example, the Website causes consumers' search strings to be transmitted to Meta, Google, and TikTok. The unauthorized sharing of such information constitutes a

---

[5] This section contains multiple examples of specific data being sent from a user's browser to third parties. Each example was collected after the user had clicked or selected the "Reject All" button. On Plaintiffs' information and belief, alternatively adjusting the available toggle buttons or settings to individually reject all categories of cookies also results in similar Website behavior in the use and placement of unnecessary cookies.

CLASS ACTION COMPLAINT

wiretapping violation. The screenshots below (the second screenshot is cropped and enlarged for readability) demonstrates the Website's sharing of the user's search for "privacy" with Meta:



50.    The Website also offers a store-locator feature that allows users to enter location information, such as a zip code, to identify nearby retail locations. For example, when a user enters "94111" into the "Find your nearest store" search field, the Website returns location-specific results. The store-locator feature currently appears on the Website as shown below:

CLASS ACTION COMPLAINT

51.     On information and belief, the Website similarly causes the information entered by users into the store-locator feature—including location data such as zip codes—to be transmitted to, and intercepted by, Third Parties while in transit between the user's browser and the Website, in the same manner as the user search queries described above. Users provide this information for the purpose of communicating with the Website to obtain location-specific results, but that communication is disclosed to Third Parties.

**2.     Facebook Cookies.**

52.     Defendant causes third-party cookies to be transmitted to and from Website users' browsers and devices to and from the **facebook.com** domain, even after users elect to reject all non-strictly necessary cookies (including Functional Cookies and Quantum Metric Recordings). This domain is associated with Meta's digital advertising and analytics platform that collects user information via cookies to assist Meta in performing data collection, behavioral analysis, user retargeting, and analytics.[6] Meta serves targeted ads to web users across Meta's ad network, which spans millions of websites and apps.

---

[6] https://www.facebook.com/privacy/policies/cookies/.

- 22 -

CLASS ACTION COMPLAINT

53.    Facebook's cookies help Meta track whether users complete specific actions after interacting with an ad (e.g., clicking a link or making a purchase) and provide analytic metrics that advertisers use to measure ad campaign performance. For example, the Website causes the following type of data to be sent to Meta when a user clicks a button on the website:

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

```
https://www.facebook.com/tr/?id=1496797887875744&e
buttonFeatures]=%7B%22classList%22%3A%22ot-pc-refu
erText%22%3A%22Reject%20All%22%2C%22numChildButton
7D&cd[buttonText]=Reject%20All&cd[formFeatures]=%5
0Goods%22%7D&sw=1920&sh=1080&v=2.9.202&r=stable&ec
oo=false&es=automatic&tm=3&exp=k0&rqm=GET
```

GET
200

**Request** Header Query Body Cookies Raw | Summary +

| Key | Value |
| --- | --- |
| id | 1496797887875744 |
| ev | SubscribedButtonClick |
| dl | https%3A%2F%2Fwww.ashleyfurniture.com%2F |
| rl | |
| if | false |
| ts | 1747766920947 |
| cd[buttonFeatures] | %7B"classList"%3A"ot-pc-refuse-all-handler"%2C"destination"%3A""%2C"id"%3A""%2C"imageUrl"%3A""%2C"innerText"%3A"Reject%20All"%2C"numChildButtons"%3A0%2C"tag"%3A"button"%2C"type"%3Anull%2C"name"%3A""%2C"value"%3A""%7D |
| cd[buttonText] | Reject%20All |
| cd[formFeatures] | %5B%5D |
| cd[pageFeatures] | %7B"title"%3A"Ashley%20%7C%20Affordable%20Home%20Furniture%20and%20Home%20Goods"%7D |
| sw | 1920 |
| sh | 1080 |

- 23 -
CLASS ACTION COMPLAINT



54. Cookies are sent along with all data transmissions to Meta. For instance, the following cookies were sent along with the button click event above:

55. The "c_user" cookie shown above enables Facebook to identify a specific user when they are logged in to their account. The "c_user "cookie stores a user's unique ID, which is associated with their Facebook profile. This ID enables Facebook to track user interactions on its platform and across sites that use Facebook plugins, such as adding items to a cart, clicking

CLASS ACTION COMPLAINT

"Like" buttons, or engaging with comment sections. When combined with other data sent to the Facebook domain, this cookie allows Meta to track users' browsing activities.

56.     Further, along with all of this data, the Meta software code that Defendant causes to be stored on and executed by the user's device causes the user's "user-agent" information to be sent to Meta:

```
user-agent                          Mozilla/5.0 (Windows NT 10.0; Win64; x64)
                                    AppleWebKit/537.36 (KHTML, like Gecko) Chrome/
                                    136.0.0.0 Safari/537.36
```

57.     The "user-agent" corresponds to the device and browser that the user has used to access the Website.

58.     In addition, the Meta software code causes the user's IP address to be transmitted to Meta.

59.     Facebook uses this data for various purposes, such as personalizing content, enhancing ad targeting accuracy, and refining its user experience.

60.     In particular, by identifying users who have shown interest in certain products or content, the facebook.com cookies enable Meta's advertising platform to enable advertisers to show relevant ads to those users when they visit other websites within Meta's ad network.[7] These cookies allow Meta to collect data on how users interact with websites, regardless of whether they have a Facebook account or are logged in.[8]

61.     The facebook.com cookies allow Meta to obtain and store at least the following user data: (i) browsing history, (ii) visit history, (iii) website interactions, (iv) user input data, (v) demographic information, (vi) interests and preferences, (vii) shopping behaviors, (viii) device information, (ix) referring URLs, (x) session information, (xi) user identifiers, and (xii) geolocation data (including IP addresses).[9]

62.     Meta utilizes the data collected through the facebook.com cookies for its own purposes, including by using the data to tailor content and target advertisements to users. This

---

[7] *Id.*; https://allaboutcookies.org/what-data-does-facebook-collect
[8] https://allaboutcookies.org/what-data-does-facebook-collect.
[9] *Id.*

CLASS ACTION COMPLAINT

includes practices such as (i) **Ad Targeting and Retargeting**, in which Meta uses the facebook.com cookie to track users' online behavior across different sites, building a profile based on their browsing habits, purchases, and interactions. This profile enables Facebook to deliver highly targeted ads within the Facebook ecosystem and on other sites that are part of Facebook's Audience Network; (ii) **Conversion Tracking**, in which Meta uses the facebook.com cookie to enable business partners to track specific actions users take after viewing or clicking on a Facebook ad, such as making a purchase or signing up for a newsletter; (iii) **Audience Insights and Analytics**, in which Meta uses the facebook.com cookie to provide data to businesses on user demographics, interests, and behaviors across their sites and apps; and (iv) **Cross-Device and Cross-Platform Tracking**, in which Meta uses the facebook.com cookie to support tracking users across devices and platforms, so that ads are targeted consistently regardless of the device a user is on. This ensures that advertisers can follow users across devices.

**3.      Google Cookies.**

63.      Defendant causes third-party cookies to be transmitted to and from Website users' browsers and devices, even after users reject all non-strictly necessary cookies (including Functional Cookies and Quantum Metric Recordings) to and from the **analytics.google.com**, and **doubleclick.net** domains. Each of these domains is associated with Google LLC's (or Alphabet Inc.'s) digital advertising and analytics platform that collects user information via cookies to assist Google in performing data collection, behavioral analysis, user retargeting, and analytics.[10] Google serves targeted ads to web users across Google's ad network, which spans millions of websites and apps. Nearly 20% of web traffic is tracked by Google's DoubleClick cookies.[11] Google's cookies help it track whether users complete specific actions after interacting with an ad (e.g., clicking a link or making a purchase) and provide analytic metrics that advertisers use to measure ad campaign performance. Further, by identifying users who have shown interest in certain products or content, Google's cookies enable its advertising platform

[10] *See* Our advertising and measurement cookies (available at https://business.safety.google/adscookies/).
[11] *See, e.g.* https://www.ghostery.com/whotracksme/trackers/doubleclick.

- 26 -

CLASS ACTION COMPLAINT

to enable advertisers to show relevant ads to those users when they visit other websites within Google's ad network.[12]

64. Specifically, Google sends cookies when a web user visits a webpage that shows Google Marketing Platform advertising products and/or Google Ad Manager ads.[13] "Pages with Google Marketing Platform advertising products or Google Ad Manager ads include ad tags that instruct browsers to request ad content from [Google's] servers. When the server delivers the ad content, it also sends a cookie. But a page doesn't have to show Google Marketing Platform advertising products or Google Ad Manager ads for this to happen; it just needs to include Google Marketing Platform advertising products or Google Ad Manager ad tags, which might load a click tracker or impression pixel instead." *Id.* As Google explains, "Google Marketing Platform advertising products and Google Ad Manager send a cookie to the browser after any impression, click, or other activity that results in a call to our servers." *Id.*

65. Google also uses cookies in performing analytical functions. As Google explains, "Google Analytics is a platform that collects data from [] websites and apps to create reports that provide insights into [] business[es]."[14] "To measure a website … [one] add[s] a small piece of JavaScript measurement code to each page on [a] site." *Id.* Then, "[e]very time a user visits a webpage, the tracking code will collect … information about how that user interacted with the page." *Id.* Google Analytics enables website owners to "measure when someone loads a page, clicks a link, [ ] makes a purchase;" "completes a purchase"; "searches [] website or app"; "select content on [] website or app"; "views an item"; and "views their shopping cart."[15]

66. Google's cookies allow it to obtain and store at least the following user data: (i) browsing history, (ii) visit history, (iii) website interactions, (iv) user input data,

---

[12] *See, e.g.* About cross-channel remarketing in Search Ads 360 (available at https://support.google.com/searchads/answer/7189623?hl=en); About dynamic remarketing for retail (available at https://support.google.com/google-ads/answer/6099158?hl=en&sjid=1196213575075458908-NC).
[13] *See* How Google Marketing Platform advertising products and Google Ad Manager use cookies (available at https://support.google.com/searchads/answer/2839090?hl=en&sjid=1196213575075458908-NC); *see also* Cookies and user identification (available at https://developers.google.com/tag-platform/security/concepts/cookies).
[14] How Google Analytics Works (available at https://support.google.com/analytics/answer/12159447?hl=en).
**[15] Set up events (available at https://developers.google.com/analytics/devguides/collection/ga4/events); and Recommended events (available at https://developers.google.com/analytics/devguides/collection/ga4/events).**

- 27 -
CLASS ACTION COMPLAINT

(v) demographic information, (vi) interests and preferences, (vii) shopping behaviors, (viii) device information, (ix) referring URLs, (x) session information, (xi) user identifiers, and (xii) geolocation data.[16]

67.    For example, the Google software code that Defendant causes to be stored on and executed by the Website user's device causes the following data to be sent to Google's domain, at analytics.google.com:

---

[16] *See* About the Google Tag (available at https://support.google.com/searchads/answer/7550511?hl=en); How Floodlight Recognizes Users (available at https://support.google.com/searchads/answer/2903014?hl=en); How Google Ads tracks website conversions (available at https://support.google.com/google-ads/answer/7521212); Google Ads Help, Cookie: Definition (available at https://support.google.com/google-ads/answer/2407785?hl=en); About demographic targeting in Google Ads (available at https://support.google.com/searchads/answer/7298581?hl=en&sjid=1196213575075458908-NC&visit_id=638670675669576522-2267083756&ref_topic=7302618&rd=1); How Google Analytics Works (https://support.google.com/analytics/answer/12159447); Set up events (available at https://developers.google.com/analytics/devguides/collection/ga4/events); and Recommended events (available at https://support.google.com/analytics/answer/9267735).

CLASS ACTION COMPLAINT

- 29 -

ul                          en-us
sr                          1920x1080
uaa                         x86
uab                         64
uafvl                       Chromium;136.0.7103.114|
                            Google%20Chrome;136.0.7103.114|Not.A%2FBrand;99.0.0.0

uamb                        0
uam
uap                         Windows
uapv                        19.0.0
uaw                         0
are                         1
pae                         1
frm                         0
pscdl                       noapi
_eu                         AEEAAAQ
_s                          3
uid                         81a89037-da03-4170-906b-f20472cb1499
sid                         1747766906
sct                         1
seg                         1
dl                          https://www.ashleyfurniture.com/
dt                          Ashley | Affordable Home Furniture and Home Goods
en                          form_start
ep.billing_zipcode
ep.shipping_zipcode

ep.storelocator_zipco
de
ep.shopping_delivery
_zipcode
ep.shopping_delivery
_store
ep.cookie_opt_in_out

ep.geo_shopping_stor
e
ep.platform                 Ashley Next
ep.form_id                  search-form

- 30 -

CLASS ACTION COMPLAINT

68. The "npa" parameter refers to "Non-Personalized Ads." When npa is set to 1, it indicates non-personalized ads preference is enabled. Here, npa is set to 0, indicating that standard (personalized) ads are enabled.

69. The "dt" parameter refers to "Document Title." Here, the user was visiting a page with the title "Ashley | Affordable Home Furniture and Home Goods."

70. The "cid" parameter refers to "Client ID." It contains a unique identifier for the user's browser and device, that enables Google to link the user to their interactions with the website.[17]

71. Along with this data, the Google software code that Defendant causes to be stored on and executed by the user's device causes the following cookie to be sent to Google's domain:

---

[17] *See, e.g.*, https://cheatography.com/dmpg-tom/cheat-sheets/google-universal-analytics-url-collect-parameters/; https://www.analyticsmarket.com/blog/how-google-analytics-collects-data/; https://www.owox.com/blog/use-cases/google-analytics-client-id/

- 31 -

CLASS ACTION COMPLAINT

72. Further, along with all of this data, the Google software code that Defendant causes to be stored on and executed by the user's device causes the user's "user-agent" information to be sent to Google:

| user-agent | Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/ 136.0.0.0 Safari/537.36 |
|---|---|

73. The "user-agent" corresponds to the device and browser that the user has used to access the Website.

74. Finally, the data sent to Google contains the user's IP address, which can be used to determine whether a user is located in California.

75. Because Google's cookies operate across multiple sites (i.e., cross-site tracking), the cookie enables Google to track users as they navigate from one site to another, and to comprehensively observe and evaluate user behavior online. Google's advertising platform aggregates user data to create consumer profiles containing detailed information about a consumer's behavior, preferences, and demographics and audience segments based on shared traits (such as females, Millennials, etc.), and to perform targeted advertising and marketing analytics.

76. Thus, the Google cookies used on the Website enable Google to track users' interactions with advertisements to help advertisers understand how users engage with ads across different websites. Further, the user data collected through the cookie enables the delivery of personalized ads based on user interests and behaviors. For instance, if a user frequently visits travel-related websites, Google will show her more travel-related advertisements. Further, the collected data is used to generate reports for advertisers, helping them assess the performance of their ad campaigns and make data-driven decisions (such as renaming their products). Further, Google's advertising platform enables advertisers to retarget marketing, which Google explains allows advertisers to "show previous visitors ads based on products or services they viewed on your website. With messages tailored to your audience, dynamic remarketing helps you build

CLASS ACTION COMPLAINT

leads and sales by bringing previous visitors back to your website to complete what they started."[18]

77.     Further, in its "Shared Data Under Measurement Controller-Controller Data Protection Terms," Google states: "Google can access and analyze the Analytics data customers share with us to better understand online behavior and trends, and improve our products and services—for example, to improve Google search results, detect and remove invalid advertising traffic in Google Ads, and test algorithms and build models that power services like Google Analytics Intelligence that apply machine-learning to surface suggestions and insights for customers based on their analytics data and like Google Ads that applies broad models to improve ads personalization and relevance. These capabilities are critical to the value of the products we deliver to customers today."[19] Thus, Google can have the capability to use the data it collects for understanding online behavior and trends, machine learning, and improving its own products and services.

### 4.     Microsoft Clarity Cookies.

78.     Defendant also causes third-party cookies to be transmitted to and from Website users' browsers and devices, even after users click or select the "Reject All" cookies button, to and from the **clarity.ms** domain. This domain is associated with Clarity, Microsoft's "cutting-edge behavioral analytics tool that helps you understand user interaction with your website or app".[20] Clarity is a Microsoft Advertising tool, which "crucial for successful marketing."[21] "Clarity's tracking code … uses a cookie to obtain user session data." [22]

---

[18] Dynamic remarketing for web setup guide (available at https://support.google.com/google-ads/answer/6077124).
[19] Shared Data Under Measurement Controller-Controller Data Protection Terms (available at https://support.google.com/analytics/answer/9024351).
[20] https://learn.microsoft.com/en-us/clarity/setup-and-installation/about-clarity.
[21] https://about.ads.microsoft.com/en/blog/post/october-2021/introducing-microsoft-clarity-insights-for-microsoft-advertising.
[22] https://learn.microsoft.com/en-us/clarity/setup-and-installation/cookie-consent.

- 33 -
CLASS ACTION COMPLAINT

79.    Clarity allows Defendant to "watch live users in action" via "recordings of live user interactions" on the website, including a user's "clicks or taps, scrolling, navigation, and more."[23] Indeed, Clarity boasts that it "tracks all visitor clicks and scrolls on mobile, desktop, and tablet[.]" These "session recordings" track each and every consumer's individual actions on the website.[24]

80.    Further, Clarity permits Defendant to aggregate individual users' session recordings into "heatmaps" for Defendant's financial gain. Heatmaps are "visualization tool[s]" aimed at "aggregat[ing] information about how users interact with the website." [25] This allows Defendant to "See at a glance which areas on [web site owner's] page drive the most engagement," a crucial element to increasing advertising revenue. [26] Clarity also permits Defendant to "track a specific subset of users," including tracking metrics like what browser users visited from, what type of device, the date, and more. Clarity even permits the use of specific "Clarity user ID[s]" which permits Clarity to track users across their devices, and identify when the same user visits multiple times to the website.[27] Businesses use Clarity to "make data-driven decisions" to "improve overall conversion rates" of clicks, engagement, or

---

[23] https://clarity.microsoft.com/session-recordings.
[24] https://clarity.microsoft.com/session-recordings.
[25] https://learn.microsoft.com/en-us/clarity/heatmaps/heatmaps-overview.
[26] https://clarity.microsoft.com/heatmaps.
[27] https://clarity.microsoft.com/insights; https://learn.microsoft.com/en-us/clarity/setup-and-installation/identify-api.

CLASS ACTION COMPLAINT

sales.[28] Microsoft notes in a Clarity case study that Clarity cookies permitted businesses to see a "substantial increase" in "purchases."[29] In one instance, "following just five days after implementing Clarity, the [business] saw an uplift of 19% in conversion rate."[30] Businesses consider Clarity a "must-have tool for any business serious about optimizing their website and increasing online revenue."[31]

81.    Microsoft collects data from Clarity,[32] which "Microsoft retains . . . for as long as necessary[.]"[33] Clarity cookies allow Microsoft to obtain and store at least the following user data: (i) user identifier; (ii) website interactions; (iii) interests and preferences; (iv) shopping behavior; (v) device information; (vi) demographic data; (vii) geolocation data; (viii) referring URL; and (ix) session information. [34]

**5.    TikTok Cookies.**

82.    Defendant also causes third-party cookies to be transmitted to and from Website users' browsers and devices, even after users elect to "Reject All" cookies, to and from the **analytics.tiktok.com** domain. This domain is associated with TikTok for Business, a suite of tools offered by TikTok, a social media platform owned by TikTok USDS Joint Venture LLC, known for short-form video sharing. The TikTok platform is used to create and share videos, and it utilizes cookies for various purposes including assisting brands and marketers to create, manage, and optimize ad campaigns on the platform.[35]

---

[28] https://clarity.microsoft.com/case-studies/ecommerce-boost/#:~:text=Using%20Clarity&text=By%20analyzing%20user%20sessions%20and,and%20improve%20overall%20conversion%20rates.

[29] *Id.*

[30] *Id.*, emphasis in original.

[31] https://clarity.microsoft.com/case-studies/ecommerce-boost/#:~:text=Using%20Clarity&text=By%20analyzing%20user%20sessions%20and,and%20improve%20overall%20conversion%20rates.

[32] https://www.microsoft.com/en-us/privacy/privacystatement.

[33] *Id*.

[34] https://learn.microsoft.com/en-us/clarity/setup-and-installation/clarity-data.

**[35] *See, e.g.*, TikTok for Business (https://ads.tiktok.com/business/en-US/products/ads; and https://ads.tiktok.com/business/en-US/products/measurement); TikTok Business Help Center; Using Cookies with TikTok Pixel (available at https://ads.tiktok.com/help/article/using-cookies-with-tiktok-pixel?lang=en).**

CLASS ACTION COMPLAINT

83.    TikTok utilizes analytics.tiktok.com cookies to collect data on user interactions with websites that have integrated TikTok's tracking technologies (such as the Website). These cookies are used to "measure and improve the performance of your advertising campaigns and to personalize the user's experience (including ads) on TikTok."[36] TikTok further explains that it uses cookies to "match events with people who engage with your content on TikTok. Matched events are used to improve measurement and optimize ad campaigns. They can also contribute to building your retargeting and engagement audiences." *Id.* These cookies enable TikTok to recognize and track users across different sessions and domains (i.e., cross-site tracking) and to collect and synchronize user data to observe and evaluate TikTok user behavior.

84.    These cookies enable TikTok to obtain and store at least the following user data: (i) browsing history, (ii) visit history, (iii) website interactions, (iv) user input data, including *email addresses and phone numbers*; (v) demographic information, (vi) interests and preferences, (vii) shopping behaviors, (viii) device information, (ix) session information, (x) user identifiers, and (xi) geolocation data in the form of the IP address.[37]

85.    For example, the TikTok software code that Defendant cause to be stored on and executed by the Website user's device causes the following data to be sent to TikTok's domain, at analytics.tiktok.com:

**[REMAINDER OF PAGE INTENTIONALLY BLANK]**

---

[36] TikTok Business Help Center; Using Cookies with TikTok Pixel (available at https://ads.tiktok.com/help/article/using-cookies-with-tiktok-pixel?lang=en).

[37] *Id.*; *see also* TikTok for Business: Enhance Data Postback with the TikTok Pixel (https://ads.tiktok.com/help/article/enhance-data-postback-with-the-tiktok-pixel?lang=en); TikTok for Business: Advanced Matching for Web (available at https://ads.tiktok.com/help/article/advanced-matching-web?redirected=1); TikTok for Business: About TikTok Pixel (available at https://ads.tiktok.com/help/article/tiktok-pixel?lang=en).

CLASS ACTION COMPLAINT

CLASS ACTION COMPLAINT

```
12      "open_graph": "{\"og:url\":\"https://www.
        ashleyfurniture.com/search-results?q=privacy\",
        \"og:type\":\"website\",\"og:title\":\"Search –
        privacy | Ashley\",\"og:description\":\"Search –
        privacy\",\"og:image\":\"https://www.ashleyfurniture.
        com/_appnext/immutable/assets/ogimage.Dgf07h4b.
        webp\",\"og:image:alt\":\"Search – privacy |
        Ashley\",\"twitter:card\":\"summary_large_image\",
        \"twitter:title\":\"Search – privacy | Ashley\",
        \"twitter:description\":\"Search – privacy\",
        \"twitter:image\":\"https://www.ashleyfurniture.com/
        _appnext/immutable/assets/ogimage.Dgf07h4b.webp\",
        \"twitter:creator\":\"@AshleyHomeStore\",
        \"twitter:domain\":\"ashleyfurniture.com\",
        \"twitter:url\":\"https://www.ashleyfurniture.com/
        search-results?q=privacy\"}"
13    },
14    "page_trigger": "PageView"
15  },
16  "context": {
17    "ad": {
18      "jsb_status": 2,
19      "sdk_env": "external"
20    },
21    "device": {
22      "platform": "pc"
23    },
24    "index": 1,
25    "library": {
26      "name": "pixel.js",
27      "version": "2.2.0"
28    },
```

CLASS ACTION COMPLAINT

```
"page": {
  "load_progress": "2",
  "referrer": "https://www.ashleyfurniture.com/",
  "url": "https://www.ashleyfurniture.com/
  search-results?q=privacy"
},
"pageview_id":
"038d604d-35ab-11f0-a17e-9e8991c35136-U7X1g.0.
1::038d2220-35ab-11f0-a17e-9e8991c35136",
"pixel": {
  "code": "CV0TDDBC77U54LNIEO0G",
  "codes": "CV0TDDBC77U54LNIEO0G",
  "runtime": "1"
},
"session_id":
"038d604d-35ab-11f0-a17e-9e8991c35136::FJOcwBrx9mgdA0id
cVoN",
"sessions": [
  {
    "csct": 1,
    "csid": "1747766906478::s2eZ7oXpdYSvYC3NIssg",
    "page_csid": "1747766906479::O3HWWmM_TyCjHakgJ9Hs",
    "pixel_code": "CV0TDDBC77U54LNIEO0G"
  }
],
"user": {
  "anonymous_id": "01JVQGD3KCPKMWQCARQR0K1NNM_.tt.1"
},
"userAgent": "Mozilla/5.0 (Windows NT 10.0; Win64;
x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/136.
0.0.0 Safari/537.36",
"variation_id": "test_2_single_track"
},
"event_id": "",
"is_onsite": false,
```

CLASS ACTION COMPLAINT

```
57      "message_id": "messageId-1747766936174-4631242476228",
58      "properties": {},
59  v   "signal_diagnostic_labels": {
60  v     "hashed_email": {
61          "label": "missing"
62        },
63  v     "hashed_phone": {
64          "label": "missing"
65        },
66  v     "raw_auto_email": {
67          "label": "missing"
68        },
69  v     "raw_auto_phone": {
70          "label": "missing"
71        },
72  v     "raw_email": {
73          "label": "missing"
74        },
75  v     "raw_phone": {
76          "label": "missing"
77        }
78      },
79      "timestamp": "2025-05-20T18:48:56.174Z"
80    }
```

86.     The data includes the "session_id," which is a unique identifier generated by TikTok to track a user's activity. This allows TikTok to correlate the user's behavior from a browsing session, including page views and conversions, to a particular user to enhance advertising measurement, attribution, and targeting.[38]

87.     The data further indicates, among other things, that the user has entered a search string for "privacy" on the Website.

88.     Along with this data, the TikTok software code that Defendant causes to be stored on and executed by the user's device causes the "_ttp" cookie to be sent to TikTok's domain:



---

[38] *See, e.g.*, How to get TikTok session id? (available at https://gbtimes.com/how-to-get-tiktok-session-id/).

CLASS ACTION COMPLAINT

89. According to TikTok's documentation, the "_ttp" cookie is one of the company's advertising cookies, the purpose of which is "[t]o measure and improve the performance of your advertising campaigns and to personalize the user's experience (including ads) on TikTok."[39]

90. Further, along with all of this data, the TikTok software code that Defendant causes to be stored on and executed by the user's device causes the user's "user-agent" information to be sent to TikTok:

user-agent          Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/
                    537.36 (KHTML, like Gecko) Chrome/136.0.0.0 Safari/
                    537.36

91. As discussed above, the "user-agent" corresponds to the device and browser that the user has used to access the Website.

92. Finally, the data sent to TikTok includes the user's IP address.

93. By collecting this user data, TikTok performs user behavior tracking, i.e., monitoring user actions like page views, clicks, and interactions to understand user engagement; advertising optimization, i.e., gathering data to enhance the relevance and effectiveness of TikTok advertising campaigns; and performance measurement (i.e., assessing the success of marketing efforts by analyze user responses to ads and content).[40]

94. Further, TikTok's Automatic Advanced Matching feature functions as follows: "When a visitor lands on your website and inputs customer information during registration, sign-in, contact, or checkout on a website where you installed your pixel, Automatic Advanced Matching will capture information from those fields. …TikTok will use hashed information to link event information to people on TikTok. Tiktok may use matched events to better attribute events to TikTok ads, optimize advertisers' future campaigns, and depending on advertisers' and users' settings, TikTok may also add people to advertisers' retargeting or engagement audiences."[41]

---

[39] *See* TikTok for Business: Using Cookies with TikTok Pixel
(available at https://ads.tiktok.com/help/article/using-cookies-with-tiktok-pixel?lang=en).
[40] *See* TikTok for Business: Using Cookies with TikTok Pixel
(available at https://ads.tiktok.com/help/article/using-cookies-with-tiktok-pixel?lang=en).
[41] TikTok for Business: How to set up Automatic Advanced Matching (available at
https://ads.tiktok.com/help/article/how-to-set-up-automatic-advanced-matching?lang=en).

CLASS ACTION COMPLAINT

**6.      LiveRamp Cookies.**

95.      Defendant causes third-party cookies to be transmitted to and from Website users' browsers and devices, even after users click or select the "Reject All" button, to and from the **rlcdn.com** and **liadm.com** domains.[42] These domains are associated with LiveRamp, a software company that allows businesses to combine customer data from various online and offline sources and leverage that data for marketing and analytics purposes.[43] LiveRamp's cookies are used to create an online identification code for the purpose of recognizing users' devices and tracking their behavior.

96.      These cookies enable LiveRamp to obtain and store at least the following user data: browsing history, visit history, website interactions, user input data (such as email address), demographic information, interests and preferences, device information, user identifiers, and geolocation data (including IP addresses), on the Website. The unique user identifier enables LiveRamp to sell a user's unique data for use in online and cross-channel advertising (including targeted advertising and email marketing).

97.      LiveRamp explains in its Privacy Notice the user data it receives from rlcdn.com cookies installed on "partner websites" and how it uses (and monetizes) that data as follows:

> [The website] partner may sell or share personal information collected from you, such as your email, cookies set on your browser, IP address, or information about your browser or operating system, with LiveRamp. LiveRamp uses this information to create an online identification code for the purpose of recognizing your device. This code may be placed in our partners' cookie and for use in online and cross-channel advertising (including targeted advertising and email marketing), or LiveRamp may connect it to LiveRamp's own 3rd-party cookie and other identifiers. In addition, by associating an email address with a cookie, LiveRamp and third parties can link your browsing activity across different websites and other applications and services to your specific device associated with the email address, identifying the user behind the device. This means that, even when browsing unrelated sites, your online activity can be connected to you for advertising and other marketing-related purposes, including email marketing and offline advertising...
>
> The personal data and identifiers we collect (for instance, a cookie ID) may be linked to other personal data and identifiers through known associations and/or

---

[42] *See* LiveRamp Product and Service Privacy Notice (available at https://liveramp.com/privacy/service-privacy-policy/).

[43] *See* https://liveramp.com/privacy/service-privacy-policy/#section1a; *see also* LiveRamp Data Marketplace (available at https://liveramp.com/data-marketplace/).

CLASS ACTION COMPLAINT

identity resolution (for instance, an identifier derived from or associated with a hashed email address and LiveRamp cookie 1234 might be associated with partner cookie 5678), and shared with advertising partners and other third party advertising companies for the purpose of enabling interest-based content or targeted advertising throughout your online and offline experiences (e.g., web, TV [MVPDs], connected TV, mobile applications, email marketing and other media). These third parties may in turn use this identifier to link demographic or interest-based information you have provided in your interactions with them. Note that LiveRamp does not itself provide the service of targeted advertising (sometimes referred to as "cross-context advertising") but, rather, processes and transfers data to an advertiser's advertising platform so that platform can provide targeted advertising services...[44]

### 7.    Additional Third-Party Cookies.

98.    Defendant also causes third-party cookies to be transmitted to and from Website users' browsers and devices, even after users elect to "Reject All" cookies, to and from other domains, including (i) rezync.com, (ii) p.cquotient.com, and (iii) lightboxcdn.com.

99.    The **rezync.com** domain is associated with Zeta Global Corp., a software company that provides a marketing and data analytics platform that collects and processes user interaction data from websites, including browsing behavior and user inputs, to build user profiles and enable targeted advertising, cross-site tracking, and real-time marketing analytics.[45] Zync collect user identifiers (including cookies and device identifiers) and track user activity such as page views, searches, purchased and other interactions, transmitting that information along with request data—including URLs and device information—to Zeta's systems for profiling, segmentation, and targeted advertising.[46]

100.    The **p.cquotient.com** domain is associated with Salesforce, Inc., a multi-billion-dollar software company that provides software applications focused on sales, customer service, marketing automation, e-commerce, and analytics.[47] CQuotient is a "customer prediction platform" provided as an "analytic software that enables multi-channel retailers to understand

---

[44] *Id.*

[45] *See, e.g.*, https://knowledgebase.zetaglobal.com/kb/learn-all-about-zmp-identifiers (explaining that Zeta creates a unique id and links it to an identity graph across sessions/devices).

[46] *See, e.g.*, https://knowledgebase.zetaglobal.com/gswz/zeta-tags-and-cookie-domains, https://knowledgebase.zetaglobal.com/gswz/preset-parameters-in-zync and https://knowledgebase.zetaglobal.com/gswz/zeta-offerings-by-website-tagging.

[47] https://en.wikipedia.org/wiki/Salesforce.

CLASS ACTION COMPLAINT

their customers."[48] Originally a separate company, CQuotient has since been acquired by Salesforce and folded into its Commerce Cloud or Unified Commerce suite of software applications.[49] These applications now feature "powerful AI that proactively helps merchants with storefront setup and channel optimization[.]"[50] While the Commerce Cloud includes tools for e-commerce that allow users to purchase products from websites, it also includes an analytic component that observes user interactions with a website in real time to make "personalized offers" to users based on their behavior.[51] All of this occurs without user knowledge or consent and, on information and belief, it occurs on Defendant's Website where the CQuotient cookie is present, even after users "Reject All" such cookies.

101.    The subdomain **tr.snapchat.com** is associated with Snap Inc., the social media company that owns Snapchat. Snapchat is multimedia messaging app that lets users share photos, videos, text, and drawings—often designed to disappear after being viewed. Snapchat uses cookies to collect identifying data and data on users' browsing history, choices, and interactions with advertisements.[52] This data helps Snap personalize ad content and track users across the internet.[53] As Snap explains, it uses the data collected by Snapchat cookies "for optimization, custom audience creation, look-alike modeling, reporting, machine learning, and targeting capabilities. All uses are … meant to deliver better results for our ad products."[54]

102.    The **lightboxcdn.com** domain is associated with Digioh LLC, a digital marketing and web design company that offers businesses tools for digital marketing, customer engagement, and advertising.[55] Digioh uses Lightboxcdn.com cookies to collect data on user's navigation and behavior on websites including information on user preferences and/or

---

[48] https://pitchbook.com/profiles/company/51447-34#overview.
[49] *Id.*
[50] https://www.salesforce.com/commerce/?cc=dwdcmain.
[51] https://www.salesforce.com/commerce/innovations.
[52] *See, e.g.*, https://businesshelp.snapchat.com/s/article/snap-privacy-faq;
https://businesshelp.snapchat.com/s/article/snap-pixel-about;
https://businesshelp.snapchat.com/s/article/conversions-api; and
https://marketingapi.snapchat.com/docs/conversion.html?shell#conversion-parameters.
[53] *Id.*
[54] Snap Business Help Center, Pixel Implementation FAQs (available at
https://businesshelp.snapchat.com/s/article/snap-pixel-faq).
[55] *See* Digio: Our Story (available at https://www.digioh.com/about).

- 44 -

CLASS ACTION COMPLAINT

interaction with web content.[56] This data helps Lightbox to personalize ad content and track users.

103.    These cookies allow these Third Parties to obtain and store at least the following user data: (i) browsing history, (ii) visit history, (iii) website interactions, (iv) demographic information, (v) interests and preferences, (vi) shopping behaviors, (vii) device information, (viii) referring URLs, (ix) session information, (x) user identifiers, and/or (xi) geolocation data—including whether a user is located in California.

**D.     The Third Parties Intercept User Communications While in Transit.**

104.    On information and belief, the Third Parties intercept user communications while those communications are in transit from consumers' browsers to Defendant's Website. The Third Parties operate large-scale data ingestion systems designed to receive, read, and act upon incoming data streams in real time, as the data is transmitted over the network, before it is committed to storage. As the user data is transmitted over the wire, it is transmitted as a raw payload that cannot be used until the Third Party reads and processes it using at least the steps described below. These steps necessarily require contemporaneous access to the contents of the communications while they are in transit.

105.    First, the Third Parties must read the data in real time in order to ***transform*** it into a usable format for subsequent processing. Transforming, for example, may involve converting long html-encoded strings and decoding them to a format such as Unicode Transformation Format, which is more amenable to subsequent processing.

106.    Second, the Third Parties read the data in real time in order to ***deduplicate*** events transmitted through multiple channels. Most websites transmit the same user interaction twice: both directly from the user's device and separately through a server-to-server API, to ensure reliability.[57] Third Party platforms encourage this redundant configuration and automatically

---

[56] *See* Digioh Knowledge Base: Digioh Site Visitor Metadata Storage (available at https://help.digioh.com/knowledgebase/digioh-site-visitor-metadata-storage/).

[57] For example, Google's server-to-server API is the **Google Ads Conversion API**. Facebook's is the **Meta Conversions API**. TikTok uses the **TikTok Events API**. Snapchat's is the **Snapchat Conversions API**. On information and belief, each of the Third Parties uses a server-to-server API to collect user data.

- 45 -

CLASS ACTION COMPLAINT

compare identifiers contained within the transmitted data—such as event identifiers and device identifiers—to determine whether multiple transmissions correspond to the same user action.[58] This deduplication occurs as the communications are received, before they are stored.

107. Third, the Third Parties read and analyze incoming communications in real time to *validate* and *filter* the data, including to detect invalid, malicious, or anomalous transmissions and to determine whether the data complies with internal processing rules. These determinations must be made immediately upon receipt of the communication in order for the Third Parties' systems to function.

108. Fourth, the Third Parties perform real-time *analytics* on user communications to determine their meaning and significance. This processing is used to interpret the data, associate it with particular users or devices, and to determine what real-time events or actions should be taken in response, such as triggering advertising delivery, notifications, or other automated responses. This step typically involves applying artificial intelligence and machine learning algorithms to the data. These determinations occur while the data is in motion, prior to final storage.

109. To accomplish each of the functions described above, the Third Parties employ real-time stream processing platforms specifically designed to operate on data "in flight"—that is, after it is transmitted from a user's browser but before it is committed to the Third Parties' storage. Examples of such platforms include Apache Flink, Kafka, and Amazon Kinesis. Industry documentation confirms that these systems are designed to read, transform, analyze, and act upon data streams as they are received.

110. For example, Meta (formerly Facebook) has publicly described its proprietary real-time stream processing platform that ingests data transmitted from users' devices and

---

[58] For example, Facebook recommends that websites use a "redundant setup" whereby "advertisers implement the Conversions API alongside their Meta Pixel." *See* "Handling Duplicate Pixel and Conversions API Events," available at https://developers.facebook.com/docs/marketing-api/conversions-api/deduplicate-pixel-and-server-events. Facebook confirms that its system automatically deduplicates events using various parameters included with the data, such as "event_id," "event_name," "fbp," and "external_id." *Id.*

CLASS ACTION COMPLAINT

websites, applies real-time transformations and personalization, and only thereafter stores the data in backend data warehouses, as illustrated in the following diagram created by Facebook:[59]

111.   As the diagram confirms, the data is sent from consumers' "Devices" and from the "Web," and then goes through the Stream Processing Pipelines **before** being stored in the data "Warehouse."

112.   Facebook's Stream Processing Pipelines perform a wide variety of real-time analytics, transformations, and AI and machine learning on the data prior to storage:[60]

---

[59] XStream: Stream Processing Platform at Facebook (video) at 1:07 (available at https://www.youtube.com/watch?v=DNI54vc1ALQ).
[60] *Id.* at 2:05.

CLASS ACTION COMPLAINT

## Use Cases @ Facebook
Diversity of Use Cases

### Stream Analytics

- **Time series analytics** – calculate metrics over time windows and stream to another Scribe category, dashboard or Scuba

- **Real time dashboards/Scuba** – aggregate and process Scribe to feed dashboards or another Scribe category

- **Real time metrics** – Custom metrics or triggers for real time monitoring, notifications or alarms

### Stream Transform

- **Clean, enrich, organize, and transform raw** Scribe prior to loading to warehouse reducing or eliminating batch ETL steps

- **Common built-in operators** to transform, aggregate, and filter streaming data

### Real-Time AI/ML

- **Enable various stages of the ML life cycle** E.g., feature engineering

- Enable **predictive analytics, fraud detection**, real-time personalization, and other advanced analytics use cases

113.    As the diagram confirms, Facebook does not merely store incoming data for later review; rather, before the data is stored, Facebook contemporaneously reads and processes it—including by reading the data, cleaning it, applying "real-time personalization" to associate it with a particular user, and analyzing its contents as necessary to generate real-time responses.

114.    On information and belief, the other Third Parties also use ingest-phase processing platforms that perform real-time analytics and filtering on incoming data streams before storage. For example, Google developed MillWheel, an internal stream processing system, as well as Flume/FlumeJava, which evolved into Google Cloud Dataflow.[61] Google Cloud Dataflow enables Google to perform many functions on real-time data at the "Ingest" phase, before it is stored.[62] Google, which sells Dataflow to third party developers for use with their own products, states that Dataflow is used "to create data pipelines that read from one or more sources, ***transform the data***, and write the data to a destination."[63] One use for Dataflow

---

[61] *See, e.g.*, Google Cloud Blog, "How cloud batch and stream data processing works" (August 2020), https://cloud.google.com/blog/products/data-analytics/how-cloud-batch-and-stream-data-processing-works.
[62] Google Cloud Blog, "BigQuery explained: An overview of BigQuery's architecture" (September 2, 2020), https://cloud.google.com/blog/products/data-analytics/new-blog-series-bigquery-explained-overview.
[63] Google Cloud Documentation, "Dataflow overview," https://docs.cloud.google.com/dataflow/docs/overview (emphasis added).

CLASS ACTION COMPLAINT

is the "[r]eal-time machine learning (ML) analysis of streaming data."[64] Google confirms that Dataflow is "suitable for more advanced applications, such as real-time streaming analytics."[65]

115.    Microsoft's Clarity also uses real-time stream processing software, which "processes millions of user sessions every day."[66] Although not as much is publicly disclosed about Microsoft's system, Microsoft confirms that the real-time data "is then sent to Clarity's backend, where it flows through a complex processing pipeline *before* ultimately being stored in ClickHouse—the powerful database that fuels Clarity's dashboards and visual reporting."[67]

116.    Accordingly, the Third Parties' platforms do not operate as passive recipients that merely record user communications. Instead, they function as active interceptors that contemporaneously read and process the contents of user communications—including the Private Communications—by transforming, deduplicating, validating and filtering and analyzing in real time while those communications are in transit between the user's browser and Defendant's Website.

**E.    The Signaling and Addressing Information Intercepted by the Third Parties.**

117.    The "signaling" and "addressing" information captured and recorded by the Third Parties includes TCP and/or UDP port numbers associated with outgoing communications initiated by Plaintiffs' and Class Members' browsers and devices. In the context of Internet Protocol (IP) networking, port numbers function as sub-addresses that direct traffic to specific software processes. By recording these port numbers, the Third Parties identify and distinguish specific network connections and the communicating endpoints involved (e.g., a Plaintiff's or Class Member's IP address and TCP/UDP source port communicating with a Third Party's destination IP address and destination port such as 443). These port numbers constitute addressing information associated with the communications initiated by Plaintiffs' and Class

---

[64] *Id.*
[65] *Id.*
[66] Clarity Blog, "Building a Scalable Analytics Platform: Why Microsoft Clarity Chose ClickHouse," https://clarity.microsoft.com/blog/why-microsoft-clarity-chose-clickhouse/.
[67] *Id.* (emphasis added).

- 49 -

CLASS ACTION COMPLAINT

Members' browsers and devices and fall within the "instruments" and "facilities" contemplated by California Penal Code § 638.50(b).

118. The "signaling" information also includes protocol-level metadata recorded by the Third Parties during connection establishment and session management, such as the initiation and acceptance of TCP connections and the TLS handshake and negotiation metadata used to establish HTTPS sessions. This signaling information is transmitted by Plaintiffs' and Class Members' devices to initiate, coordinate, and manage electronic communications with the Third Parties. Because this metadata enables management of the connection rather than the substance of the message, it constitutes record information regarding the characteristics of the communication, rather than communication content, and falls squarely within the statutory definition of a pen register.

119. Additionally, the Third Parties record HTTP request header metadata, such as the "Host" header and connection-management headers (e.g., "Connection" in HTTP/1.1), which function as digital "dialing" information. Just as a traditional pen register records the number dialed to reach a destination, these headers identify the intended web origin (via "Host") and specify how the client requests the connection be handled for that request (e.g., whether to keep the connection open). This header information is transmitted as part of the Plaintiffs' and Website users' HTTP requests and, together with the destination network address and port, enables the receiving Third Party to identify and log the destination and handling characteristics of Plaintiffs' and Website users' communications, separate from any underlying user input or message content.

120. Finally, the Third Parties' receiving infrastructure (e.g., servers, edge services, and/or load balancers) observes and records network-level and transport-level routing and addressing metadata associated with communications initiated by Plaintiffs' and Website users' browsers and devices. This metadata includes destination IP addresses, port identifiers (such as 443 for HTTPS), and related connection and session attributes, including connection initiation and termination timestamps, connection duration, and identifiers such as the protocol used (TCP

CLASS ACTION COMPLAINT

or UDP), the source IP address, the source port, the destination IP address, and the destination port. The Third Parties use this information in real time to identify and log the origin and destination endpoints of Plaintiffs' and Website users' electronic communications and the characteristics of those connections, separate from any substantive "message" or "contents" carried at the higher-level Application layer.

**F.    The Private Communications Collected are Valuable.**

121.    As part of its regular course of business, Defendant targets California consumers by causing the Third Parties to extract, collect, maintain, distribute, and exploit for Defendant's and the Third Parties' profit, all of the Private Communications transferred by the cookies which Defendant causes to be placed on Plaintiffs' and other California Website users' devices without their knowledge or consent. Defendant knew the location of consumers like Plaintiffs and the Class members either prior to or shortly after causing the Third Parties to use cookies on their devices.

122.    The Private Communications tracked and collected through cookies on the Website are valuable to Defendant and the Third Parties. Defendant uses this data to measure and optimize marketing campaigns, evaluate website design and product placement, and target specific users or groups of users with advertising. For example, Defendant can identify California users who visit webpages related to particular furniture products and then target those users with advertisements for similar products both on the Website and across unrelated third-party websites.

123.    Data reflecting users' browsing activity allows Defendant to identify behavioral patterns, preferences, and interests relating to Defendant's products. At scale, this data enables Defendant to assess trends across its brands and within the broader furniture market. Defendant monetizes this data by leveraging it to increase user engagement, advertising effectiveness, and overall revenue.

124.    The value of the Private Communications tracked and collected by the Third Parties using cookies on the Website can be quantified. Legal scholars observe that "[p]ersonal

CLASS ACTION COMPLAINT

information is an important currency in the new millennium."[68] Indeed, "[t]he monetary value of personal data is large and still growing, and corporate America is moving quickly to profit from the trend." *Id*. "Companies view this information as a corporate asset and have invested heavily in software that facilitates the collection of consumer information." *Id*.

125. Numerous empirical studies quantify the appropriate value measure for personal data. Generally, the value of personal data is measured as either the consumer's willingness to accept compensation to sell her data or the consumer's willingness to pay to protect her information.

126. By falsely representing consumers' ability to decline non-strictly necessary cookies, and by aiding, agreeing with, employing, permitting, or otherwise enabling the Third Parties to collect users' Private Communications, Defendant unjustly enriches themselves at the expense of consumer privacy and autonomy. Defendant deprives consumers of the ability to decide whether, and on what terms, their data may be monetized.

**PLAINTIFFS' EXPERIENCES**

**Plaintiff Tucker**

127. Plaintiff Tucker visited the Website to seek information about Ashley Furniture's products, while located in California, on one or more occasions during the last four years. During those visits, Plaintiff Tucker searched the Website for specific furniture items, including couches and dining tables, and entered search queries such as "reclining couches with USB ports."

128. Plaintiff Tucker's visits to the Website were consistent with an ordinary Website user's visits seeking information about Defendant's products. Specifically, Plaintiff Tucker is not a consumer advocate, a "tester," or a compliance auditor that visited the Website to test or evaluate Defendant's privacy practices.

129. When Plaintiff Tucker visited the Website, it immediately detected that she was a visitor in California and presented her with Defendant's popup cookie consent banner and Privacy Preference Center, which provided the option to click or select the "Reject All" cookies

---

[68] *See* Paul M. Schwartz, *Property, Privacy and Personal Data*, 117 Harv. L. Rev. 2055, 2056–57 (2004).

- 52 -

CLASS ACTION COMPLAINT

button. Plaintiff Tucker viewed Defendant's representation on the popup cookie consent banner that, "By using this site you agree to our use of cookies and session replay tools to collect real-time information about your use of our site. We use the information to optimize the performance of our website, enhance site navigation, analyze site usage, and assist in our marketing efforts." Plaintiff Tucker also viewed Defendant's additional representation that users could, rather than choose to "Accept All Cookies" for these and other purposes, instead "Configure" the use of cookies on the Website.

130.    Plaintiff Tucker selected and clicked the "Configure" button. In doing so, Plaintiff Tucker was then presented with Defendant's Privacy Preference Center. There, Plaintiff Tucker viewed Defendant's further representations that she could "Manage Consent Preferences" to "Reject All" cookies in use on the Website, including all Functional Cookies, Quantum Metric Recordings, Performance Cookies, and Targeting Cookies (except those "Strictly Necessary Cookies" the Website needed to function), by clicking or selecting the button to do so.

131.    Plaintiff Tucker believed that clicking or selecting the "Reject All" button on the Privacy Preference Center found on the Website would allow her to opt out of, decline, and/or reject all non-strictly necessary cookies and other tracking technologies (inclusive of those cookies that collect real-time information about Plaintiff Tucker and users' use of the Website and cause the disclosure of tracking data to third-party marketing and analytics services for the purposes of analyzing site usage and delivering targeted advertising).

132.    In selecting the "Reject All" button, Plaintiff Tucker gave Defendant notice that she did not consent to the use or placement of cookies and tracking technologies while browsing the Website. Further, Plaintiff Tucker specifically rejected, based on Defendant's representations, those cookies and tools or technologies used to "collect real-time information about your use of our site" and share information with third parties. In reliance on these representations and promises, only then did Plaintiff Tucker continue browsing the Website.

133.    Even before the popup cookie consent banner or Privacy Preference Center window appeared on the screen, Defendant nonetheless caused cookies and tracking

technologies, including those used for marketing, analytics, and session replay, to be placed on Plaintiff Tucker's device and/or transmitted to the Third Parties along with user data, without Plaintiff Tucker's knowledge. Accordingly, the popup cookie consent banner's representation to Plaintiff Tucker that she could reject the use and/or placement of all non-strictly necessary cookies and tracking technologies while she browsed the Website was false. Contrary to what Defendant made Plaintiff Tucker believe, she did not have a choice about whether third-party cookies would be placed on her device and/or transmitted to the Third Parties along with her user data; rather, Defendant had already caused that to happen.

134. Then, as Plaintiff Tucker continued to browse the Website in reliance on the promises Defendant made in the cookie consent banner and Privacy Preference Center, and, despite Plaintiff Tucker's clear rejection of the use and/or placement of such cookies and tracking technologies, Defendant nonetheless continued to cause the placement and/or transmission of cookies and other tools or technologies along with user data, including those involved in providing marketing, analytics, and session replay from the Third Parties on her device. In doing so, Defendant permitted the Third Parties to track and collect Plaintiff Tucker's Private Communications as Plaintiff Tucker browsed the Website.

135. Defendant's representations that consumers could "Reject All" cookies and other tools or technologies while Plaintiff Tucker and users browsed the Website, or at least those involved in providing marketing, analytics, and real-time collection (or session replay), were untrue. Had Plaintiff Tucker known this fact, she would not have used the Website. Moreover, Plaintiff Tucker reviewed the popup cookie consent banner and Privacy Preference Center prior to using the Website. Had Defendant disclosed that they would continue to cause cookies and tracking technologies to be stored on consumers' devices even after they choose to reject all non-strictly necessary cookies, Plaintiff Tucker would have noticed it and would not have used the Website or, at a minimum, she would have interacted with the Website differently.

136. Plaintiff Tucker continues to desire to browse content featured on the Website. Plaintiff Tucker would like to browse websites that do not misrepresent that users can reject all

non-strictly necessary cookies and tracking technologies. If the Website were programmed to honor users' requests to reject all non-strictly necessary cookies and tracking technologies, Plaintiff Tucker would likely browse the Website again in the future, but will not do so until then. Plaintiff Tucker regularly visits websites that feature content similar to that of the Website. Because Plaintiff Tucker does not know how the Website is programmed, which can change over time, and because she does not have the technical knowledge necessary to test whether the Website honors users' requests to reject all non-strictly necessary cookies and tracking technologies, Plaintiff Tucker will be unable to rely on Defendant's representations when browsing the Website in the future absent an injunction that prohibits Defendant from making misrepresentations on the Website. The only way to determine what network traffic is sent to third parties when visiting a website is to use a specialized tool such as Chrome Developer Tools. As the name suggests, such tools are designed for use by "developers" (i.e., software developers), whose specialized training enables them to analyze the data underlying the HTTP traffic to determine what data, if any, is being sent to whom. Plaintiff Tucker is not a software developer and has not received training with respect to HTTP network calls.

**Plaintiff Driscoll**

137.    Plaintiff Driscoll visited the Website to obtain information about Ashley Furniture's products, while located in California, on one or more occasions during the last four years.

138.    Plaintiff Driscoll's visits to the Website were consistent with an ordinary Website user's visits seeking information about Defendant's products. Specifically, Plaintiff Driscoll is not a consumer advocate, a "tester," or a compliance auditor that visited the Website to test or evaluate Defendant's privacy practices.

139.    When Plaintiff Driscoll visited the Website, it immediately detected that she was a visitor in California and presented her with Defendant's popup cookie consent banner and Privacy Preference Center, which provided the option to click or select the "Reject All" cookies button. Plaintiff Driscoll viewed Defendant's representation on the popup cookie consent banner

CLASS ACTION COMPLAINT

that, "By using this site you agree to our use of cookies and session replay tools to collect real-time information about your use of our site. We use the information to optimize the performance of our website, enhance site navigation, analyze site usage, and assist in our marketing efforts." Plaintiff Driscoll also viewed Defendant's additional representation that users could, rather than choose to "Accept All Cookies" for these and other purposes, instead "Configure" the use of cookies on the Website.

140.    Plaintiff Driscoll selected and clicked the "Configure" button. In doing so, Plaintiff Driscoll was then presented with Defendant's Privacy Preference Center. There, Plaintiff Driscoll viewed Defendant's further representations that she could "Manage Consent Preferences" to "Reject All" cookies in use on the Website, including all Functional Cookies, Quantum Metric Recordings, Performance Cookies, and Targeting Cookies (except those "Strictly Necessary Cookies" the Website needed to function), by clicking or selecting the button to do so.

141.    Plaintiff Driscoll believed that clicking or selecting the "Reject All" button in the Privacy Preference Center found on the Website would allow her to opt out of, decline, and/or reject all non-strictly necessary cookies and other tracking technologies (inclusive of those cookies that collect real-time information about Plaintiff Driscoll and users' use of the Website and cause the disclosure of tracking data to third-party marketing and analytics services for the purposes of analyzing site usage and delivering targeted advertising).

142.    In selecting the "Reject All" button, Plaintiff Driscoll gave Defendant notice that she did not consent to the use or placement of cookies and tracking technologies while browsing the Website. Further, Plaintiff Driscoll specifically rejected, based on Defendant's representations, those cookies and tools or technologies used to "collect real-time information about your use of our site" and share information with third parties. In reliance on these representations and promises, only then did Plaintiff Driscoll continue browsing the Website.

143.    Even before the popup cookie consent banner or Privacy Preference Center window appeared on the screen, Defendant nonetheless caused cookies and tracking

- 56 -
CLASS ACTION COMPLAINT

technologies, including those used for marketing, analytics, and session replay, to be placed on Plaintiff Driscoll's device and/or transmitted to the Third Parties along with user data, without Plaintiff Driscoll's knowledge. Accordingly, the popup cookie consent banner's representation to Plaintiff Driscoll that she could reject the use and/or placement of all non-strictly necessary cookies and tracking technologies while she browsed the Website was false. Contrary to what Defendant made Plaintiff Driscoll believe, she did not have a choice about whether third-party cookies would be placed on her device and/or transmitted to the Third Parties along with her user data; rather, Defendant had already caused that to happen.

144.    Then, as Plaintiff Driscoll continued to browse the Website in reliance on the promises Defendant made in the cookie consent banner and Privacy Preference Center, and, despite Plaintiff Driscoll's clear rejection of the use and/or placement of such cookies and tracking technologies, Defendant nonetheless continued to cause the placement and/or transmission of cookies and other tools or technologies along with user data, including those involved in providing marketing, analytics, and session replay from the Third Parties on her device. In doing so, Defendant permitted the Third Parties to track and collect Plaintiff Driscoll's Private Communications as Plaintiff Driscoll browsed the Website.

145.    Defendant's representations that consumers could "Reject All" cookies and other tools or technologies while Plaintiff Driscoll and users browsed the Website, or at least those involved in providing marketing, analytics, and real-time collection (or session replay), were untrue. Had Plaintiff Driscoll known this fact, she would not have used the Website. Moreover, Plaintiff Driscoll reviewed the popup cookie consent banner and Privacy Preference Center prior to using the Website. Had Defendant disclosed that they would continue to cause cookies and tracking technologies to be stored on consumers' devices even after they choose to reject all non-strictly necessary cookies, Plaintiff Driscoll would have noticed it and would not have used the Website or, at a minimum, she would have interacted with the Website differently.

146.    Plaintiff Driscoll continues to desire to browse content featured on the Website. Plaintiff Driscoll would like to browse websites that do not misrepresent that users can reject all

non-strictly necessary cookies and tracking technologies. If the Website were programmed to honor users' requests to reject all non-strictly necessary cookies and tracking technologies, Plaintiff Driscoll would likely browse the Website again in the future, but will not do so until then. Plaintiff Driscoll regularly visits websites that feature content similar to that of the Website. Because Plaintiff Driscoll does not know how the Website is programmed, which can change over time, and because she does not have the technical knowledge necessary to test whether the Website honors users' requests to reject all non-strictly necessary cookies and tracking technologies, Plaintiff Driscoll will be unable to rely on Defendant's representations when browsing the Website in the future absent an injunction that prohibits Defendant from making misrepresentations on the Website. The only way to determine what network traffic is sent to third parties when visiting a website is to use a specialized tool such as Chrome Developer Tools. As the name suggests, such tools are designed for use by "developers" (i.e., software developers), whose specialized training enables them to analyze the data underlying the HTTP traffic to determine what data, if any, is being sent to whom. Plaintiff Driscoll is not a software developer and has not received training with respect to HTTP network calls.

## CLASS ALLEGATIONS

147.    Plaintiffs bring this Class Action Complaint on behalf of themselves and a proposed class of similarly situated persons, pursuant to Rules 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure. Plaintiffs seek to represent the following group of similarly situated persons, defined as follows:

> **Class**: All persons who browsed the Website in the State of California after clicking or selecting the "Reject All" button in the Privacy Preference Center, or all persons who, in the alternative, adjusted the available toggle buttons or settings in Privacy Preference Center to reject non-strictly necessary cookies.

148.    This action has been brought and may properly be maintained as a class action against Defendant because there is a well-defined community of interest in the litigation and the proposed class is easily ascertainable.

- 58 -
CLASS ACTION COMPLAINT

149.   **Numerosity:** Plaintiffs do not know the exact size of the Class, but they estimate that it is composed of more than 100 persons. The persons in the Class are so numerous that the joinder of all such persons is impracticable and the disposition of their claims in a class action rather than in individual actions will benefit the parties and the courts.

150.   **Common Questions Predominate:** This action involves common questions of law and fact to the Class because each class member's claim derives from the same unlawful conduct that led them to believe that Defendant would not cause third-party cookies to be placed on their browsers and devices and/or transmitted to third parties along with user data, after Class members chose to reject all non-strictly necessary cookies and tracking technologies on the Website, nor would Defendant permit third parties to track and collect Class members' Private Communications as Class members browsed the Website.

151.   The common questions of law and fact predominate over individual questions, as proof of a common or single set of facts will establish the right of each member of the Class to recover. The questions of law and fact common to the Class are:

a.   Whether Defendant's actions violate California laws invoked herein; and

b.   Whether Plaintiffs and Class members are entitled to damages, restitution, injunctive and other equitable relief, reasonable attorneys' fees, prejudgment interest and costs of this suit.

152.   **Typicality:** Plaintiffs' claims are typical of the claims of the other members of the Class because, among other things, Plaintiffs, like the other Class members, visited the Website, rejected non-strictly necessary cookies, and had their confidential Private Communications intercepted by the Third Parties.

153.   **Adequacy of Representation:** Plaintiffs will fairly and adequately protect the interests of all Class members because it is in her best interests to prosecute the claims alleged herein to obtain full compensation due to her for the unfair and illegal conduct of which they complain. Plaintiffs also have no interests in conflict with, or antagonistic to, the interests of Class members. Plaintiffs have retained highly competent and experienced class action attorneys

- 59 -

CLASS ACTION COMPLAINT

to represent their interests and those of the Class. By prevailing on their claims, Plaintiffs will establish Defendant's liability to all Class members. Plaintiffs and their counsel have the necessary financial resources to adequately and vigorously litigate this class action, and Plaintiffs and counsel are aware of their fiduciary responsibilities to the Class members and are determined to diligently discharge those duties by vigorously seeking the maximum possible recovery for Class members.

154.    **Superiority:** There is no plain, speedy, or adequate remedy other than by maintenance of this class action. The prosecution of individual remedies by members of the Class will tend to establish inconsistent standards of conduct for Defendant and result in the impairment of Class members' rights and the disposition of their interests through actions to which they were not parties. Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. Furthermore, as the damages suffered by each individual member of the Class may be relatively small, the expenses and burden of individual litigation would make it difficult or impossible for individual members of the class to redress the wrongs done to them, while an important public interest will be served by addressing the matter as a class action. Plaintiffs are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## CAUSES OF ACTION

### First Cause of Action: Invasion of Privacy

155.    Plaintiffs reallege and incorporate the paragraphs of this Complaint as if set forth herein.

156.    To plead an invasion of privacy claim, Plaintiffs must show an invasion of (i) a legally protected privacy interest; (ii) where Plaintiffs had a reasonable expectation of privacy in the circumstances; and (iii) conduct by Defendant constituting a serious invasion of privacy.

CLASS ACTION COMPLAINT

157. Defendant has intruded upon the following legally protected privacy interests of Plaintiffs and Class members: (i) the California Invasion of Privacy Act, as alleged herein; (ii) the California Constitution, which guarantees Californians the right to privacy; (iii) the California Wiretap Acts as alleged herein; (iv) Cal. Penal Code § 484(a), which prohibits the knowing theft or defrauding of property "by any false or fraudulent representation or pretense;" and (v) Plaintiffs' and Class members' Fourth Amendment right to privacy.

158. Plaintiffs and Class members had a reasonable expectation of privacy under the circumstances, as Defendant affirmatively promised users they could "Reject All" non-strictly necessary cookies and tracking technologies before proceeding to browse the Website. Plaintiffs and other Class members directed their electronic devices to access the Website and, when presented with the popup cookies consent banner on the Website, Plaintiffs and Class members rejected non-strictly necessary cookies and reasonably expected that their rejection of non-strictly necessary cookies and tracking technologies would be honored. That is, they reasonably believed that Defendant would not permit the Third Parties to store and send cookies and/or use other such tracking technologies on their devices while they browsed the Website. Plaintiffs and Class members also reasonably expected that, if they rejected such cookies and/or tracking technologies, Defendant would not permit the Third Parties to track and collect Plaintiffs' and Class members' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, on the Website.

159. Such information is "personal information" under California law, which defines personal information as including "Internet or other electronic network activity information," such as "browsing history, search history, and information regarding a consumer's interaction with an internet website, application, or advertisement." Cal. Civ. Code § 1798.140.

160. Defendant, in violation of Plaintiffs' and other Class members' reasonable expectation of privacy and without their consent, permits the Third Parties to use cookies and

CLASS ACTION COMPLAINT

other tracking technologies to collect, track, and compile users' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California. The data that Defendant allowed third parties to collect enables the Third Parties to (and they in fact do), *inter alia*, create consumer profiles containing detailed information about a consumer's behavior, preferences, and demographics; create audience segments based on shared traits (such as Millennials, Californians, tech enthusiasts, etc.); and perform targeted advertising and marketing analytics. Further, the Third Parties share user data and/or the user profiles to unknown parties to further their financial gain. The consumer profiles are and can be used to further invade Plaintiffs' and users' privacy, by allowing third parties to learn intimate details of their lives, and target them for advertising and other purposes, as described herein, thereby harming them through the abrogation of their autonomy and their ability to control dissemination and use of information about them.

161. Defendant's actions constituted a serious invasion of privacy in that it invaded a zone of privacy protected by the Fourth Amendment (i.e., one's personal communications), and violated criminal laws on wiretapping and invasion of privacy. These acts constitute an egregious breach of social norms that is highly offensive.

162. Defendant's intrusion into Plaintiffs' privacy was also highly offensive to a reasonable person.

163. Defendant lacked a legitimate business interest in causing the placement and/or transmission of third-party cookies along with user data that allowed the Third Parties to track, intercept, receive, and collect Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, without their consent.

- 62 -

CLASS ACTION COMPLAINT

164. Plaintiffs and Class members have been damaged by Defendant's invasion of their privacy and are entitled to just compensation, including monetary damages.

165. Plaintiffs and Class members seek appropriate relief for that injury, including but not limited to, damages that will compensate them for the harm to their privacy interests as well as disgorgement of profits made by Defendant as a result of its intrusions upon Plaintiffs' and Class members' privacy.

166. Plaintiffs and Class members seek punitive damages because Defendant's actions—which were malicious, oppressive, willful—were calculated to injure Plaintiffs and Class members and made in conscious disregard of Plaintiffs' and Class members' rights and Plaintiffs' and Class members' rejection of the Website's use of non-strictly necessary cookies. Punitive damages are warranted to deter Defendant from engaging in future misconduct.

### Second Cause of Action: Intrusion Upon Seclusion

167. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

168. To assert a claim for intrusion upon seclusion, Plaintiffs must plead (i) that Defendant intentionally intruded into a place, conversation, or matter as to which Plaintiffs had a reasonable expectation of privacy; and (ii) that the intrusion was highly offensive to a reasonable person.

169. By permitting third-party cookies to be stored on consumers' devices without consent, which caused the Third Parties to track and collect Plaintiffs' and Class members' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, in violation of Defendant's representations otherwise in the popup cookie consent banner, Defendant intentionally intruded upon the solitude or seclusion of Website users. Defendant effectively placed the Third Parties in the middle of communications to which they were not invited, welcomed, or authorized.

CLASS ACTION COMPLAINT

170. The Third Parties' tracking and collecting of Plaintiffs' and Class member's Private Communications on the Website using third-party cookies that Defendant caused to be stored on users' devices—and to be transmitted to Third Parties—was not authorized by Plaintiffs and Class members, and, in fact, those Website users specifically chose to "Reject All" non-strictly necessary cookies.

171. Plaintiffs and the Class members had an objectively reasonable expectation of privacy surrounding her and their Private Communications on the Website based on Defendant's promise that users could "Reject All" non-strictly necessary cookies, as well as state criminal and civil laws designed to protect individual privacy.

172. Defendant's intentional intrusion into Plaintiffs' and other users' Private Communications would be highly offensive to a reasonable person given that Defendant represented that Website users could "Reject All" non-strictly necessary cookies when, in fact, Defendant caused such third-party cookies to be stored on consumers' devices and browsers, and to be transmitted to third parties, even when consumers rejected all such cookies. Indeed, Plaintiffs and Class members reasonably expected, based on Defendant's false representations, that when they rejected all non-strictly necessary cookies and tracking technologies, Defendant would not cause such third-party cookies to be stored on her and their devices or permit the Third Parties to obtain their Private Communications on the Website, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California.

173. Defendant's conduct was intentional and intruded on Plaintiffs' and users' Private Communications on the Website.

174. Plaintiffs and Class members have been damaged by Defendant's invasion of their privacy and are entitled to just compensation, including monetary damages.

175. Plaintiffs and Class members seek appropriate relief for that injury, including but not limited to, damages that will compensate them for the harm to their privacy interests as well

as disgorgement of profits made by Defendant as a result of its intrusions upon Plaintiffs' and Class members' privacy.

176.    Plaintiffs and Class members seek punitive damages because Defendant's actions—which were malicious, oppressive, willful—were calculated to injure Plaintiffs and Class members and made in conscious disregard of Plaintiffs' and Class members' rights and Plaintiffs' and Class members' rejection of the Website's use of non-strictly necessary cookies. Punitive damages are warranted to deter Defendant from engaging in future misconduct.

**Third Cause of Action: Wiretapping in Violation of the California Invasion of Privacy Act (California Penal Code § 631)**

177.    Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

178.    California Penal Code § 631(a) provides, in pertinent part:

"Any person who, by means of any machine, instrument, or contrivance, or in any other manner . . . willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section, is punishable by a fine not exceeding two thousand five hundred dollars . . . ."

179.    The California Supreme Court has repeatedly stated an "express objective" of CIPA is to "protect a person placing or receiving a call from a situation where the person on the other end of the line permits an outsider to tap his telephone or listen in on the call." *Ribas v. Clark*, 38 Cal. 3d 355, 364 (1985) (emphasis added).

180.    Further, as the California Supreme Court has held, in explaining the legislative purpose behind CIPA:

While one who imparts private information risks the betrayal of his confidence by the other party, a substantial distinction has been recognized between the secondhand repetition of the contents of a conversation and *its simultaneous dissemination to an unannounced second auditor, whether that auditor be a person or mechanical device.*

- 65 -
CLASS ACTION COMPLAINT

As one commentator has noted, such secret monitoring denies the speaker an important aspect of privacy of communication— the right to control the nature and extent of the firsthand dissemination of his statements.

*Ribas*, 38 Cal. 3d at 360-61 (emphasis supplied; internal citations omitted).

181. CIPA § 631(a) imposes liability for "distinct and mutually independent patterns of conduct." *Tavernetti v. Superior Ct.*, 22 Cal. 3d 187, 192-93 (1978). Thus, to establish liability under § 631(a), Plaintiffs need only establish that Defendant, "by means of any machine, instrument, contrivance, or in any other manner," did *any* of the following:

[i] Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system;

[ii] Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state;

[iii] Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained

Cal. Penal Code § 631(a).

182. CIPA § 631(a) also penalizes those who [iv] "aid[], agree[] with, employ[], or conspire[] with any person" who conducts the aforementioned wiretapping, or those who "permit" the wiretapping.

183. Each Defendant is a "person" within the meaning of California Penal Code § 631.

184. Section 631(a) is not limited to phone lines, but also applies to "new technologies" such as computers, the Internet, and email. *See Matera v. Google Inc.*, 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); *see also Bradley v. Google, Inc.*, 2006 WL 3798134, at *5–6 (N.D. Cal. Dec. 22, 2006) (CIPA governs "electronic communications"); *Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1 (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, Section 631(a) applies to Internet communications.").

CLASS ACTION COMPLAINT

185.    The Third Parties' cookies—as well as the software code of the Third Parties responsible for placing the cookies and transmitting data from user devices to the Third Parties—constitute "machine[s], instrument[s], or contrivance[s]" under the CIPA (and, even if they do not, Defendant's deliberate and purposeful scheme that facilitated the interceptions falls under the broad statutory catch-all category of "any other manner").

186.    Each of the Third Parties is a "separate legal entity that offers [a] 'software-as-a-service' and not merely a passive device." *Saleh v. Nike, Inc.*, 562 F. Supp. 3d 503, 520 (C.D. Cal. 2021). Further, the Third Parties had the capability to use the wiretapped information for their own purposes and, as alleged above, they did in fact use the wiretapped information for their own business purposes. Accordingly, the Third Parties were third parties to any communication between Plaintiffs and Class members, on the one hand, and Defendant, on the other. *Id.* at 521; *see also Javier v. Assurance IQ, LLC*, 649 F. Supp. 3d 891, 900 (N.D. Cal. 2023).

187.    Under § 631(a), Defendant must show they had the consent of all parties to a communication.

188.    At all relevant times, the Website caused Plaintiffs and Class members' browsers to store the Third Parties' cookies and to transmit those cookies alongside Private Communications—including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—to the Third Parties without Plaintiffs' and Class members' consent. By configuring the Website in this manner, Defendant willfully aided, agreed with, employed, permitted, or otherwise caused the Third Parties to wiretap Plaintiffs and Class members using the Third Parties' cookies and to accomplish the wrongful conduct alleged herein.

189.    At all relevant times, by their cookies and corresponding software code, the Third Parties willfully and without the consent of all parties to the communication, or in any unauthorized manner, read, attempted to read, and/or learned the contents or meaning of

CLASS ACTION COMPLAINT

electronic communications of Plaintiffs and Class members, on the one hand, and Defendant, on the other, while the electronic communications were in transit or were being sent from or received at any place within California.

190.    The Private Communications of Plaintiffs and Class members, on the one hand, and Defendant, on the other, that the Third Parties automatically intercepted directly communicates the Website user's affirmative decisions, actions, choices, preferences, and activities, which constitute the "contents" of electronic communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California.

191.    At all relevant times, the Third Parties used or attempted to use the Private Communications automatically intercepted by their cookie tracking technologies for their own purposes.

192.    Plaintiffs and Class members did not provide their prior consent to the Third Parties' intentional access, interception, reading, learning, recording, collection, and usage of Plaintiffs' and Class members' electronic communications. Nor did Plaintiffs and Class members provide their prior consent to Defendant's aiding, agreeing with, employing, permitting, or otherwise enabling the Third Parties' conduct. On the contrary, Plaintiffs and Class members expressly declined to allow Third Parties' cookies and tracking technologies to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' electronic communications by choosing to reject non-strictly necessary cookies in the consent banner.

193.    The wiretapping of Plaintiffs and Class members occurred in California, where Plaintiffs and Class members accessed the Website and where the Third Parties—as caused by Defendant—routed Plaintiffs' and Class members' electronic communications to Third Parties' servers. Among other things, the cookies, as well as the software code responsible for placing the cookies and transmitting them and other Private Communications to the Third Parties,

CLASS ACTION COMPLAINT

resided on Plaintiffs' California-located device. In particular, the user's California-based device, after downloading the software code from the Third Parties' servers, (i) stored the code onto the user's disk; (ii) converted the code into machine-executable format; and (iii) executed the code, causing the transmission of data (including cookie data) to and from the Third Parties.

194. Plaintiffs and Class members have suffered loss by reason of these violations, including, but not limited to, (i) violation of her and their right to privacy, (ii) loss of value in her and their Private Communications, (iii) damage to and loss of Plaintiffs' and Class members' property right to control the dissemination and use of their Private Communications, and (iv) loss of their Private Communications to the Third Parties with no consent.

195. Pursuant to California Penal Code § 637.2, Plaintiffs and Class members have been injured by the violations of California Penal Code § 631, and each seeks statutory damages of the greater of $5,000, or three times the amount of actual damages, for each of Defendant's violations of CIPA § 631(a), as well as injunctive relief.

196. Unless enjoined, Defendant will continue to commit the illegal acts alleged herein including, but not limited to, permitting third parties to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' electronic Private Communications with Defendant. Plaintiffs, Class members, and the general public continue to be at risk because Plaintiffs, Class members, and the general public frequently use the internet to search for information and content related to furniture and home décor products. Plaintiffs, Class members, and the general public continue to desire to use the internet for that purpose. Plaintiffs, Class members, and the general public have no practical way to know if their request to reject non-strictly necessary cookies and tracking technologies will be honored and/or whether Defendant will permit third parties to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' electronic Private Communications with Defendant. Further, Defendant has already permitted the Third Parties to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' electronic Private Communications with Defendant and will continue to do so unless and until enjoined.

CLASS ACTION COMPLAINT

**Fourth Cause of Action**: Use of a Pen Register in Violation of the California Invasion of Privacy Act (California Penal Code § 638.51)

197.    Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

198.    The California Invasion of Privacy Act, codified at Cal. Penal Code §§ 630 to 638, includes the following statement of purpose:

> The Legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society.

199.    California Penal Code Section 638.51(a) proscribes any "person" from "install[ing] or us[ing] a pen register or a trap and trace device without first obtaining a court order."

200.    A "pen register" is a "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b).

201.    The Third Parties' cookies and the corresponding software code installed by Defendant on its Website are each "pen registers" because they are "device[s] or process[es]" that "capture[d]" the "routing, addressing, or signaling information"—including, the IP address and user-agent information—from the electronic communications transmitted by Plaintiffs' and the Class's computers or devices. Cal. Penal Code § 638.50(b).

202.    At all relevant times, Defendant caused pen registers (e.g., the Third Party software code and cookies) to be placed on Plaintiffs' and Class members' browsers and devices. This software code established and maintained network connections between the users' devices and the Third Parties, and also caused cookies, user data and metadata, and addressing and networking information (including, without limitation, IP addresses, port numbers, protocol-level metadata, HTTP request header metadata, and and user-agent information), to be transmitted to the Third Parties. *See Greenley v. Kochava,* 2023 WL 4833466, at *15-16 (S.D.

CLASS ACTION COMPLAINT

Cal. July 27, 2023); *Shah v. Fandom, Inc.*, 2024 U.S. Dist. LEXIS 193032, at *5-11 (N.D. Cal. Oct. 21, 2024).

203.    Some of the information collected by the Third Parties' cookies and the corresponding software, including IP addresses and user-agent information, does not constitute the content of Plaintiffs' and the Class members' electronic communications with the Website. *In re Zynga Privacy Litig.*, 750 F.3d 1098, 1008 (9th Cir. 2014). ("IP addresses constitute addressing information and do not necessarily reveal any more about the underlying contents of communication…") (cleaned up).

204.    Plaintiffs and Class members did not provide their prior consent to Defendant's use of third-party cookies and the corresponding software. On the contrary, Plaintiffs and the Class members informed Defendant that they did not consent to the Website's use of third-party cookies by clicking or selecting the "Reject All" button in the Privacy Preference Center.

205.    Defendant did not obtain a court order to install or use the third-party cookies and corresponding software to track and collect Plaintiffs' and Class member's IP addresses and user-agent information.

206.    As a direct and proximate result of Defendant's conduct, Plaintiffs and Class members suffered losses and were damaged in an amount to be determined at trial.

207.    Pursuant to Penal Code § 637.2(a)(1), Plaintiffs and Class members are also entitled to statutory damages of $5,000 for each of Defendant's violations of § 638.51(a).

**Fifth Cause of Action: Common Law Fraud, Deceit and/or Misrepresentation**

208.    Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

209.    Defendant fraudulently and deceptively informed Plaintiffs and Class members that they could "Reject All" non-strictly necessary cookies.

210.    However, despite Defendant's representations otherwise, Defendant caused third-party cookies and software code to be stored on consumers' devices, and to be transmitted to the Third Parties alongside Private Communications, even after users clicked or selected the "Reject All" non-strictly necessary cookies button in the Privacy Preference Center. These cookies and

corresponding software code allowed the Third Parties to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' Private Communications, even when consumers had previously chosen to "Reject All" non-strictly necessary cookies.

211. These misrepresentations and omissions were known exclusively to, and actively concealed by Defendant, not reasonably known to Plaintiffs and Class members, and material at the time they were made. Defendant knew, or should have known, how the Website functioned, including the Third Party's resources it installed on the Website and the third-party cookies in use on the Website, through testing the Website, evaluating its performance metrics by means of its accounts with the Third Parties, or otherwise, and knew, or should have known, that the Website's programming allowed the third-party cookies to be placed on users'—including Plaintiffs'—browsers and devices and/or transmitted to the Third Parties along with users' Private Communications, even after users attempted to "Reject All" non-strictly necessary cookies, which Defendant promised its users they could do. Defendant's misrepresentations and omissions concerned material facts that were essential to the analysis undertaken by Plaintiffs and Class members as to whether to use the Website. In misleading Plaintiffs and Class members and not so informing them, Defendant breached its duty to Plaintiffs and Class members. Defendant also gained financially from, and as a result of, its breach.

212. Plaintiffs and Class members relied to their detriment on Defendant's misrepresentations and fraudulent omissions.

213. Plaintiffs and Class members have suffered an injury-in-fact, including the loss of money and/or property, as a result of Defendant's unfair, deceptive, and/or unlawful practices, including the unauthorized interception of their Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, which have value as demonstrated by the use and sale of consumers' browsing activity, as alleged above. Plaintiffs and Class members

CLASS ACTION COMPLAINT

have also suffered harm in the form of diminution of the value of their private and personally identifiable information and communications.

214. Defendant's actions caused damage to and loss of Plaintiffs' and Class members' property right to control the dissemination and use of their personal information and communications.

215. Defendant's representations that consumers could reject non-strictly necessary cookies and technologies (including "cookies and session replay tools to collect real-time information" about use of the Website, in addition to those that "analyze site usage, and assist in [Defendant's] marketing efforts") if they clicked or selected the "Reject All" button (or otherwise adjusted the available settings) was untrue. Again, had Plaintiffs and Class members known these facts, they would not have used the Website. Moreover, Plaintiffs and Class members reviewed the popup cookie consent banner and Privacy Preference Center prior to their interactions with the Website. Had Defendant disclosed that they caused third-party non-strictly necessary cookies to be stored on Website visitors' devices that are related to marketing, analytics, and session replay or real-time information collection, and/or share information with third parties even after they choose to reject all such non-strictly necessary cookies, Plaintiffs and Class members would have noticed it and would not have interacted with the Website.

216. By and through such fraud, deceit, misrepresentations and/or omissions, Defendant intended to induce Plaintiffs and Class members to alter their positions to their detriment. Specifically, Defendant fraudulently and deceptively induced Plaintiffs and Class members to, without limitation, use the Website under the mistaken belief that Defendant would not permit third parties to obtain users' Private Communications when consumers chose to reject non-strictly necessary cookies. As a result, Plaintiffs and the Class provided more personal data than they would have otherwise.

217. Plaintiffs and Class members justifiably and reasonably relied on Defendant's misrepresentations and omissions, and, accordingly, were damaged by Defendant's conduct.

- 73 -

CLASS ACTION COMPLAINT

218.    As a direct and proximate result of Defendant's misrepresentations and/or omissions, Plaintiffs and Class members have suffered damages, as alleged above, and are entitled to just compensation, including monetary damages.

219.    Plaintiffs and Class members seek punitive damages because Defendant's actions—which were malicious, oppressive, willful—were calculated to injure Plaintiffs and Class members and made in conscious disregard of Plaintiffs' and Class members' rights and Plaintiffs' and Class members' rejection of the Website's use of non-strictly necessary cookies. Punitive damages are warranted to deter Defendant from engaging in future misconduct.

**Sixth Cause of Action: Unjust Enrichment**

220.    Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

221.    Defendant created and implemented a scheme to increase its own profits through a pervasive pattern of false statements and fraudulent omissions.

222.    Defendant was unjustly enriched as a result of its wrongful conduct, including through its misrepresentation that users could "Reject All" non-strictly necessary cookies, and by permitting the Third Parties to store and transmit cookies on Plaintiffs' and Class members' devices and browsers, which permitted the Third Parties to track and collect users' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, even after Class members rejected such cookies.

223.    Plaintiffs and Class members' Private Communications have conferred an economic benefit on Defendant.

224.    Defendant has been unjustly enriched at the expense of Plaintiffs and Class members, and Defendant has unjustly retained the benefits of its unlawful and wrongful conduct.

225.    Defendant appreciated, recognized, and chose to accept the monetary benefits that Plaintiffs and Class members conferred onto Defendant at their detriment. These benefits were

CLASS ACTION COMPLAINT

the expected result of Defendant acting in its pecuniary interest at the expense of Plaintiffs and Class members.

226.   It would be unjust for Defendant to retain the value of Plaintiffs' and Class members' property and any profits earned thereon.

227.   There is no justification for Defendant's enrichment. It would be inequitable, unconscionable, and unjust for Defendant to be permitted to retain these benefits because the benefits were procured as a result of its wrongful conduct.

228.   Plaintiffs and Class members are entitled to restitution of the benefits Defendant unjustly retained and/or any amounts necessary to return Plaintiffs and Class members to the position they occupied prior to having their Private Communications tracked and collected by the Third Parties.

229.   Plaintiffs plead this claim separately, as well as in the alternative, to their other claims, as without such claims Plaintiffs would have no adequate legal remedy.

## **PRAYER FOR RELIEF**

**WHEREFORE**, reserving all rights, Plaintiffs, on behalf of themselves and the Class members, respectfully requests judgment against Defendant as follows:

A.   Certification of the proposed Class, including appointment of Plaintiffs' counsel as class counsel;

B.   An award of compensatory damages, including statutory damages where available, to Plaintiffs and Class members against Defendant for all damages sustained as a result of Defendant's wrongdoing, including both pre- and post-judgment interest thereon;

C.   An award of punitive damages;

D.   An award of nominal damages;

E.   An order for full restitution;

F.   An order requiring Defendant to disgorge revenues and profits wrongfully obtained;

CLASS ACTION COMPLAINT

G.      An order temporarily and permanently enjoining Defendant from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

H.      For reasonable attorneys' fees and the costs of suit incurred; and

I.      For such further relief as may be just and proper.

Dated: April 24, 2026

**GUTRIDE SAFIER LLP**

/s/ Seth A. Safier
Seth A. Safier (State Bar No. 197427)
  seth@gutridesafier.com
Marie A. McCrary (State Bar No. 262670)
  marie@gutridesafier.com
Todd Kennedy (State Bar No. 250267)
  todd@gutridesafier.com
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 639-9090
Facsimile:  (415) 449-6469

*Attorneys for Plaintiffs*

CLASS ACTION COMPLAINT